Donald R. MARTIN, Appellant,

v.

UNITED STATES FIDELITY AND
GUARANTY COMPANY,
Respondent.

No. 81408.

Supreme Court of Missouri,
En Banc.

June 29, 1999.

Wally Bley, Mark D. Pfeiffer, Columbia, for Appellant.

Kathy M. Wilke, Clayton, for Respondent.

RONNNIE L. WHITE, Judge.

This appeal arises from an action seeking a declaration that USF & G, the liability insurer for the City of Boonville, is obligated to compensate appellant, Donald Martin, for the injuries he suffered as a result of the negligent conduct of Melvin Cauthon, his supervisor at the city's waste water treatment plant. The threshold question is whether Mr. Cauthon, the chief operator of the plant, is an "executive officer" within the meaning of USF & G's policy. The trial court concluded that he was not. We find that the term "executive officer," as it is used in this policy, is ambiguous and could encompass a position such as Mr. Cauthon's; we, therefore, hold that Mr. Cauthon was an insured under the contract. The judgment is reversed in part, affirmed in part, and remanded.

## I. Factual and Procedural Background

While working at the City of Boonville waste water treatment plant on July 5, 1988, Donald Martin was injured when a joint pipe flange assembly exploded and a portion of the assembly struck him in the head. In June 1993, after recovering $125,000 in workers' compensation, Mr. Martin filed a petition in Cooper County Circuit Court alleging that Melvin Cauthon negligently installed the joint pipe flange assembly that injured Mr. Martin. Mr. Cauthon tendered defense of the case to USF & G, the city's commercial liability insurance carrier. After USF & G denied coverage, Mr. Cauthon filed a motion to dismiss alleging that he was immune from suit because he was a supervisory employee. The motion was denied, and Mr. Martin and Mr. Cauthon then entered into an agreement whereby Mr. Cauthon withdrew his responsive pleadings and Mr. Martin agreed that he would not attempt to collect any judgment against Mr. Cauthon's personal assets.[1] Mr. Martin agreed to collect judgment only against the insurance proceeds from USF & G. On January 8, 1996, a default hearing was held and the trial court entered judgment against Mr. Cauthon in the sum of $800,000.

On April 11, 1996, Mr. Martin filed this declaratory judgment action against USF & G, seeking a declaration that Mr. Cauthon was an insured under the policy. USF & G counterclaimed. Evidence was heard, and the trial court entered judgment in favor of USF & G and against Mr. Martin, ruling that he had failed to establish that Mr. Cauthon was an insured un-

1. See section 537.065, RSMo 1994.

der the terms of the city's commercial general liability insurance policy. Specifically, the court concluded that Mr. Cauthon's duties as chief operator of the plant did not qualify him as an "executive officer" under the policy.

## II. "Executive Officer"

■ Under the commercial general liability policy at issue here, an "executive officer" is an insured while acting in the scope of his duties as an officer, while "employees other than executive officers" are not insureds for injuries caused to co-workers:

1. If you are designated in the declarations as ... an organization other than a partnership or joint venture, you are insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured:

A. Your employees other than your executive officers, but only for acts within the scope of their employment by you. However, none of these employees is an insured for (1) 'bodily injury' or 'personal injury' to you or to a co-employee while in the course of his or her employment.

The phrase "executive officer" is not defined in the policy, and the parties agree that the phrase has not been defined in previous Missouri caselaw. Mr. Martin contends that an executive officer is one "who actively participate[s] in the control, supervision and management" of an enterprise, or that the phrase is ambiguous. At trial, Mr. Martin presented evidence showing that, as chief operator of the plant, Mr. Cauthon was responsible for supervising from two to five employees and that he had input into the hiring and firing of these subordinates but was not ultimately responsible for such decisions. The evidence also showed that Mr. Cauthon was responsible for preparing a budget for the plant, which was submitted to his superior, the Director of Public Works, who submitted the budget to the city council for final approval. Mr. Cauthon also had discretionary spending authority up to $150.00, but to exceed that limit Mr. Cauthon needed permission from the Director of Public Works and the City Administrator. USF & G argues that the term is unambiguous and that the evidence presented is sufficient to demonstrate that Mr. Cauthon was not an executive officer.

■ In a bench-tried case, the judgment of the trial court will be affirmed "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law."[2] Whether an insurance policy is ambiguous is a question of law.[3] "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy. Language is ambiguous if it is reasonably open to different constructions."[4] "When policy language is ambiguous, it must be construed against the insurer."[5] "When interpreting the language of an insurance policy, this Court gives a term its ordinary meaning, unless it plainly appears that a technical meaning was intended. The ordinary meaning of a term is the meaning that the average layperson would reasonably understand."[6] "To determine the ordinary meaning of a term, this Court consults standard English language dictionaries."[7]

Dictionary definitions offer little assistance in defining what "executive officer"

2. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

3. *Gulf Ins. Co. v. Noble Broadcast,* 936 S.W.2d 810, 813 (Mo. banc 1997).

4. *Id.* at 813–14.

5. *Id.* at 814.

6. *Farmland Industries, Inc.* v. *Republic Ins. Co.,* 941 S.W.2d 505, 508 (Mo. banc 1997).

7. *Id.*

means. Webster's Third New International Dictionary defines "executive officer" as the second in command in a military unit, a definition that is inapplicable here.[8] An "officer" is "one who holds an office: one who is appointed or elected to serve in a position of trust, authority, or command...."[9] The adjective "executive" has several meanings possibly appropriate here: "relating to execution or carrying into effect"; "qualified for, concerned with, or relating to the execution of the laws or the conduct of public and national affairs"; "active, effectual, or skillful in managing, directing, or accomplishing."[10] Thus, the ordinary meaning of "executive officer" (in a commercial context) would appear to be one who holds a position of trust or authority related to the active management or direction of some task. This sense is possibly best captured in the definition of the noun "executive," which means "one who holds a position of administrative or managerial responsibility in a business or other organization" and is a synonym for "officer."[11]

Legal authorities have not proved more successful in settling on a definition of "executive officer." Black's Law Dictionary defines "executive officer" as:

An officer of the executive department of government; one in whom resides the power to execute the laws; one whose duties are to cause the laws to be executed and obeyed. Officers who are neither judicial nor legislative are executive officers. One who assumes command or control and directs course of business, or some part thereof, and who outlines

duties and directs work of subordinate employees. President and vice president of corporation are executive officers.[12]

The Minnesota Supreme Court found the term "patently ambiguous" in the context of a municipality, as opposed to a corporation.[13] Analogizing to the corporate context, the *Holm* court adopted a definition including as executive officers: "a city's mayor or manager, councilmen, administrative board members, and department heads, while excluding employees whose duties are largely ministerial."[14] The *Holm* Court also recognized, however, that the plain meaning of "executive officer" in a governmental context would be any officer of the executive branch of the municipality.[15] Even in the corporate context, courts have found the phrase to be inherently ambiguous.[16] Most telling, perhaps, is the fact that USF & G's brief itself does not provide a definition of what USF & G believes the words "executive officer" mean. We conclude that the phrase "executive officer," at least as applied to a municipality, is ambiguous and that it is reasonably susceptible to the construction given it by Mr. Martin. The evidence shows that the chief operator of the waste water treatment plant actively participated in the control, supervision, and management of the plant; Mr. Cauthon was, therefore, an executive officer of the city and an insured under the contract.

■ As noted above, executive officers are insureds under the policy only with respect to their "duties as officers." USF & G argues, and the trial court agreed, that the conduct complained of in Mr. Mar-

8. Webster's Third New International Dictionary 794 (1966).

9. *Id.* at 1567.

10. *Id.* at 794.

11. *Id.*

12. Black's Law Dictionary 569 (6th ed.1990) (internal citations omitted).

13. *Holm v. Mutual Serv. Cas. Co.,* 261 N.W.2d 598, 600 (Minn.1977).

14. *Id.* at 601.

15. *Id.* at 602; *see also Bouis v. Employers Liab. Assurance Corp.,* 160 So.2d 36 (La.Ct. App.1963) (holding chief of police an executive officer because a member of the executive branch and an officer).

16. *See e.g., Young v. New Hampshire Indemnity Co.* 120 N.H. 882, 424 A.2d 205 (1980) and the cases cited therein.

tin's petition, the installation of a pipe, was not managerial or administrative in character and, therefore, not within the scope of his duties as an officer. While USF & G does not contest that Mr. Cauthon's actions in installing the pipe were within his job responsibilities as chief operator, USF & G argues that "duties as officers" include only those portions of an officer's position that are managerial in character. Mr. Martin argues that all job responsibilities performed by executive officers are included in their duties as officers, whether or not the character of the particular act at issue was managerial. Again, the insurance policy on this point is ambiguous, at best, and the Court is bound to construe it against the insurer and in favor of coverage. Melvin Cauthon was an "executive officer" of Boonville, and because he was performing his duties as such when his allegedly negligent conduct occurred, he was an insured under the city's commercial liability insurance policy with USF & G. The trial court misapplied the law in failing to so declare, and its judgment is accordingly reversed.

### III. Amount Of Coverage

Mr. Martin also assigns error to the trial court's declaration that the limit of coverage under the policy in this case was $100,-000. The policy at issue here is a standard form commercial liability policy, which limits recovery to $800,000 per occurrence. However, the policy also contains an amendatory "Governmental Subdivision" endorsement, which modifies the standard form contract and provides that bodily injury recovery is limited to $100,000 per person.

■ Mr. Martin first argues that the only evidence submitted regarding the terms of the subject insurance contract, including the amount of coverage therein, was plaintiff's Exhibit 4, a copy of the insurance contract, not including the amendatory endorsement, which apparent-

ly had been provided by defense counsel to plaintiff's counsel. Mr. Martin argues that because USF & G failed to object to the admission of Exhibit 4, it has waived any allegation that the contract submitted was not complete and must be held to the terms of that exhibit. This argument is not persuasive because failure to object to this exhibit does not concede that Exhibit 4 constitutes the insurance contract in its entirety. In fact, Mr. Martin simultaneously submitted the amendatory endorsement that USF & G argues is part of the contract into evidence as Exhibit 7 when Exhibit 4 was admitted. USF & G did not waive its claim that the contract submitted by Mr. Martin was incomplete merely by failing to object to the contract at the time it was submitted, since the remainder of the contract was simultaneously offered.

■ Mr. Martin next argues that the endorsement (labeled CL/CG 25 03 10 87) is not a part of the policy, since it is not referred to in the declaration sheet. He argues that while endorsement CG2503 is referenced on the declaration sheet, this reference does not follow the method of reference to other amendments and, therefore, should not be construed to refer to amendatory endorsement CL/CG 25 03 10 87.

■ Appellant agrees that many of the references omitted the final four digits that signified the date of the amendment's incorporation into the contract, but argues that the proper reference to CL/CG 25 03 10 87 in the declaration sheet under such a system would be CL/CG 2503. This argument is without merit. Where the agreement of the parties is evidenced by several documents that refer to each other, are closely related, and constitute one complicated interdependent transaction, the meaning of those documents must be gleaned from the entire transaction and not simply from isolated portions of a single document.[17] Further, while it does not

---

17. *Central City Ltd. Partnership v. United Postal Sav. Ass'n.*, 903 S.W.2d 179, 182–83 (Mo. App.1995).

necessarily follow that instruments made at the same time and relating to the same subject constitute a single contract, such a determination should be made in light of the intention of the parties and with regard to the realities of the situation.[18] When an entity such as the City of Boonville purchases a general commercial liability policy, a standard policy is sent that includes many different forms, sections, and endorsements. This type of contract structure is necessary to conform a general-purpose contract to the specific needs of various insureds. The policy is by necessity assembled in such a way; one must, therefore, look to the included amendments and endorsements to construe the meaning of the policy as a whole.[19] Furthermore, the Court prefers a contract construction that gives meaning to all provisions of an instrument to a construction that leaves a portion of the writing useless and inexplicable.[20] While USF & G's reference to CL/CG 25 03 10 87 could have been more clear, its inclusion in the insurance contract received by the city demands that its terms be included in the contract as specified.

■ Mr. Martin next maintains that the endorsement is ambiguous because it is subtitled "Governmental Subdivisions." Specifically, Mr. Martin argues that because Mr. Cauthon is not himself a governmental subdivision, the endorsement is ambiguous and should be interpreted as inapplicable in this case. This argument is frivolous. The endorsement clearly and unambiguously states that $100,000 is "the most [USF & G] will pay for each person . . . because of 'bodily injury' sustained by one person as the result of any one 'occurrence.'" The limit is not premised, as Mr. Martin suggests, on the alleged tortfeasor being a governmental subdivision.

Mr. Martin contends that if the endorsement were applicable in all instances of bodily injury under this contract, then USF & G would never have to pay a claim for the full policy limit of $800,000. This is simply not the case. The limits of this policy are written to provide coverage up to the limits contained within section 537.610, RSMo 1986,[21] and distinguish between a per person limit and a per occurrence limit. Thus, if an accident occurs in which two people were injured, then the policy limits would provide recovery in the amount of $100,000 per person or $200,000. If eight people are injured, the limits would be $100,000 per person or $800,000 in aggregate. If twenty people are injured in a single accident, the per occurrence limit would limit recovery to $800,000.

■ Finally, Mr. Martin argues that because USF & G failed to mention the $100,000 per person endorsement in its denial of coverage letter to Mr. Cauthon, the company is estopped from asserting it in this proceeding. While estoppel may operate to bar a defense to a claim of coverage, it does not create coverage where none existed under the policy in the first place.[22] The coverage provided by USF & G's policy is limited to $100,000 per person for bodily injury. The trial court properly so declared, and its judgment on this point is affirmed.

Our resolution of the above points renders Appellant's remaining points on ap-

18. *Greenberg v. Dowdy*, 930 S.W.2d 512, 514 (Mo.App.1996).

19. *Tri–State Gas Co. v. Kansas City Southern Ry. Co.*, 484 S.W.2d 252, 254 (Mo.1972).

20. *Harris v. Union Elec. Co.*, 622 S.W.2d 239, 248 (Mo.App.1981); *see also Harnden v. Continental Ins. Co.*, 612 S.W.2d 392, 394 (Mo.App.1981).

21. This section provided a maximum amount of liability insurance that a political subdivision in Missouri may purchase. At the time of the accident, the City of Boonville was prevented by this statute from purchasing more coverage than $100,000 per person and $800,000 in the aggregate per occurrence. The statute also provided that the State's waiver of governmental immunity for such actions does not exceed these limits.

22. *Great West Cas. Co. v. Wenger*, 748 S.W.2d 926, 928–29 (Mo.App.1988).

peal moot. The judgment of the trial court is affirmed in part, reversed in part, and remanded with directions to enter judgment declaring that Melvin Cauthon was an insured under the policy at issue here, and for further proceedings consistent with this opinion.

All concur.