LIBERTY MUTUAL INSURANCE COMPANY, Appellant,

v.

Ken HAVNER, et al., Defendant,

Nichols Bellefeuille, Respondent.

No. WD 61014.

Missouri Court of Appeals, Western District.

March 25, 2003.

Rehearing Denied May 27, 2003.

John M. Graham, Jr., Kansas City, MO, for Appellant.

Leland F. Dempsey, Kansas City, MO, for Respondent.

Before LOWENSTEIN, P.J., SMART and NEWTON, JJ.

HAROLD L. LOWENSTEIN, Judge.

Appellant Liberty Mutual Insurance Company filed this declaratory judgment action seeking a determination that a homeowners policy issued to Ken and June Havner ("the Havners") did not require it either to indemnify or to defend the Havners' grandson, Mathew Lilly, in a suit for injuries brought on behalf of respondent, Bellefeuille. Both parties filed motions for summary judgment. The trial court ruled in favor of Bellefeuille.

In December 1998, ten-year-old Nicholas Bellefeuille, the respondent, was playing with Mathew Lilly, also a minor, in the home of Mathew's father, who apparently lived on property owned by the Havners.[1] The boys were playing with .22 rifles. Mathew, believing his weapon to be unloaded, attempted to scare Nicholas by pointing his gun at him and pulling the trigger.[2]

---

1. The location of the injury is irrelevant to the ultimate issue in this case: Was Mathew covered by the Havners' homeowners policy with Liberty Mutual. The policy does not condi-tion coverage on the location of injury-inducing act.

2. On appeal, Liberty Mutual does not argue that Mathew either assaulted or battered

But the gun was loaded, and, when Mathew pulled the trigger, Nicholas was hit in the abdomen. Liberty Mutual had issued a homeowners policy to the Havners, Mathew's grandparents. The policy provided coverage to the Havners and any "residents of your household who are your relatives."

The resolution of this appeal turns on the unique living arrangements of the Havners and their daughter Donnie and grandson Mathew ("the Lillys"). The Lillys started living in a house on a ten-acre parcel of land owned by the Havners sometime in 1993 or 1994. The Havners also live in a different house on the same land. Though not physically connected, the two houses are twenty feet apart, and, like the other two houses on the land, use the same utility lines. The Havners' home is surrounded by the Lillys' house and three other houses. The Lillys and the Havners have separate phone numbers, though they are listed under Mr. Havner's name. The mail comes to a single mailing address.

The Havners are very generous to the Lillys. The Lillys neither have to pay rent nor pay for the utilities. Every weekday, Mr. Havner drives Mathew to and from school. After Mathew comes home from school, the Havners baby-sit him until— and sometimes after—Donnie returns from work. When Mathew is sick and Donnie is at work, the Havners watch him. The Havners do not charge Donnie for either service. Mr. Havner gives Mathew an allowance, as he does to all his grandchildren. Mr. Havner sorts the mail for his daughter. Sometimes the Havners eat meals with the Lillys at the Havners' house; according to Mr. Havner's deposition, they share a meal a day. On occasion, Mathew spends the night with the Hav-

ners, especially when Donnie is out of town, though usually Mathew sleeps at his mom's house. Sometimes Mr. Havner buys Mathew clothing. Asked why he does all these things for his daughter, Mr. Havner stated in a deposition that he spoils all his daughters—a second daughter also lives on the same property as Donnie—to keep them around. Mr. Havner describes the Lillys and the Havners as a "close family."

Donnie is not completely dependant on the Havners. She is a school teacher, and there is no indication that Mr. Havner gives her money for support. Mr. Havner does not play a role in the discipline of Mathew. Nothing indicates that the Havners help determine which school Mathew is to attend, with whom he is to associate, the extracurricular activities he is allowed to participate in, when he is to go to religious services (or if he is to go at all), or who his doctor is.

Liberty Mutual makes two points on appeal—(1) that the trial court erred in denying Liberty Mutual's motion for summary judgment; (2) in the alternative, that summary judgment in favor of Bellefeuille was erroneous because there were disputed material facts as to whether Mathew Lilly was a member of the Havners' household.

■ Summary judgment should be granted if there is no genuine dispute of material facts and the moving party has a right to judgment as a matter of law. *ITT Commercial Fin. Corp v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). The propriety of summary judgment is reviewed *de novo*. *Id.* The record is read in the light most favorable to the party against whom summary judgment was granted, assuming as true

Nicholas and thus could not be covered by the Havners' policy because of the intentional act

exclusion. This court declines to review for plain error. *See* Rule 84.13(c).

all the facts properly pled by the nonmoving party and all inferences therefrom. *Jacobs v. Jacobs,* 272 S.W.2d 185, 188 (Mo. 1954). Reversal of a grant of summary judgment is required if either (1) there is a genuine dispute as to a material fact (i.e., the record contains evidence of two plausible but contrary accounts of key facts) or (2) the trial court erred as a matter of law. *Id.* The judgment of the court shall be affirmed if sustainable on any theory presented to the court. *Roberts Fertilizer, Inc. v. Steinmeier,* 748 S.W.2d 883, 886 (Mo.App.1988).

Liberty Mutual argues that the trial court erred because the Havners and Mathew were members of two distinct households, therefore, the Havners' policy did not cover Mathew.

■■■ In general, the meaning of an insurance contract and, in particular, coverage is a question of law, which this court decides without deference to the trial court's interpretation. *Lang v. Nationwide Mut. Fire Ins. Co.,* 970 S.W.2d 828, 830 (Mo.App.1998), *Opies Milk Haulers v. Twin City Fire Ins.,* 755 S.W.2d 300, 302 (Mo.App.1988) (holding that it was error for trial court to submit question of coverage to jury), respectively. Any ambiguities are construed against the insurer. *Krombach v. Mayflower Ins. Co.,* 827 S.W.2d 208, 210 (Mo. banc 1992). A provision is ambiguous if reasonably susceptible to two or more interpretations. *Knipp v. Truck Ins. Exch.,* 857 S.W.2d 281, 284 (Mo.App.1993); *Earl v. State Farm Mut. Auto. Ins. Co.,* 820 S.W.2d 623, 625 (Mo. App.1991). In short, if a provision in an insurance policy is susceptible to two or more meanings, the contract is ambiguous, and the court must adopt the meaning that is most advantageous to the insured's position.

The Havners' policy provides coverage to any "relatives" who are "residents" of the Havners' "household." The critical words are "resident," "household," and "relatives," none of which are defined by the policy. There is no doubt that Mathew is a relative of the Havners. The pivotal issue in this case is whether a relative living rent-free on the insureds' real-estate in a home twenty feet away from the insureds' home is covered as a relative who resides in the insureds' household. Whether a person is a resident of another's household is a question of fact; *See American Family Mut. Ins. Co. v. Hoffman ex rel. Schmutzler,* 46 S.W.3d 631, 633–34 (Mo.App.2001). In this case, there are no genuine questions of material fact. Under the facts as stated by Mathew, he is not covered by the Havners' policy (thus rendering moot Liberty Mutual's second point on appeal).

Bellefeuille invites this court to re-examine this court's holding in *Watt by Watt v. Mittelstadt* that the term "household" is unambiguous, 690 S.W.2d 807, 815–16 (Mo. App.1985), a holding acquiesced in by the eastern district. *See Cameron Mut. Ins. Co. v. Marler,* 926 S.W.2d 62, 64 (Mo.App. 1996).

The opinion in *Watt* acknowledged a previous opinion of the Supreme Court of Missouri that opined, "'Household' is a chameleon like word. The definition depends on the facts of each case. It is difficult to deduce any general principles", language suggesting the ambiguous nature of the word "household." 690 S.W.2d at 815 (quoting *Cobb v. State Sec. Ins. Co.,* 576 S.W.2d 726, 738 (Mo. banc 1979)). After canvassing the cases, both foreign and domestic, on the meaning of "household," this court stated that "these authorities reveal a struggle of determining whether, under a prescribed set of facts an individual is an insured or not within the terms of any insurance policy," overlooking inconsistencies among the proffered definitions

(e.g., one concluding and one denying that living under the same household is essential) and failing to decide whether any of the possible definitions were unreasonable. *Id.* at 815–16. The referenced struggle is a product of a latent ambiguity. *See General Am. Life Ins. Co. v. Barrett,* 847 S.W.2d 125, 131 (Mo.App.1993) ("An ambiguity is patent if it arises through the analysis of the language of the agreement and latent if language, which is plain on its face, becomes uncertain upon application.").

This court in *Watt* defined "household" as:

> a collection of persons, whether related by consanguinity or affinity or not related at all but who live or reside together as a single group or unit which is of a permanent and domestic character, with one head, under one roof or within a single curtilage; who have a common subsistence and who direct their attention toward a common goal consisting of their mutual interest and happiness.[3]

690 S.W.2d at 816. *See also Mission Ins. Co. v. Ward,* 487 S.W.2d 449, 451–52 (Mo. banc 1972); *Giokaris v. Kincaid,* 331 S.W.2d 633, 640 (Mo.1960).

■ "Curtilage" is unclear. *Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 603 (6th Cir.1998) ("[T]he law defining curtilage remains unclear."); *United States v. Reilly,* 76 F.3d 1271, 1281 (2nd Cir.1996) (Calabresi, J.) ("[T]he boundaries of curtilage are naturally and necessarily imprecise[.]"), as are "domestic character" and "common subsistence." Because the meaning of the court's definition is indistinct, it is ambiguous. *See Martin v. U.S. Fid. & Guar. Co.,* 996 S.W.2d 506, 508 (Mo. banc 1999) (insurance policy is ambiguous

where its meaning is duplicitous, uncertain, or indistinct). "Household" in a homeowners policy, then, is ambiguous when undefined by the policy.

■ Though insurance policies must be interpreted to provide coverage whenever reasonably possible, *Greer v. Zurich Ins. Co.,* 441 S.W.2d 15, 30 (Mo.1969), there is no coverage under any reasonable interpretation of the Havners' policy because Mathew, though he visits his grandparents and stays at their house on occasion, does not live under the same roof as the Havners. Nor is his house within the curtilage of the Havners'. Black's Law Dictionary has extensively defined "curtilage":

> Originally, it referred to the land and outbuildings immediately adjacent to a castle that were in turn surrounded by a high stone wall; today, its meaning has been extended to include any land or building immediately adjacent to a dwelling, and usually it is enclosed some way by a fence or shrubs.

> For search and seizure purposes, includes those outbuildings which are directly and intimately connected with the habitation and in proximity thereto and the land or grounds surrounding the dwelling which are necessary and convenient and habitually used for family purposes and carrying on domestic employment.

BLACK'S LAW DICTIONARY 384 (6th ed.1991). The seventh edition of Black's Law Dictionary defines "curtilage" as "[t]he land or yard adjoining a house, usu[ally] within an enclosure." BLACK'S LAW DICTIONARY 389 (7th ed.1999). "At common law, the curtilage is the area to which extends the intimate activity asso-

---

**3.** *Cameron Mutual Insurance Co. v. Marler* also adopted the *Watt* definition of "household." 926 S.W.2d 62, 64 (Mo.App.1996). In *Cameron,* the issue was the same, but the facts

very different. There were not two different houses, only one, and, thus, the "under the same roof" element was not in issue.

ciated with the 'sanctity of a man's home and the privacies of life' ... and therefore has been considered part of the home itself[.]" *Oliver v. U.S.,* 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886)). *See State v. Fierge,* 673 S.W.2d 855, 856 (Mo.App.1984) ("The curtilage includes all out-buildings used in connection with the residence, such as garages, sheds, barns, yards, and lots connected with or in the close vicinity of the residence."). *See also* 25 C.J.S. *Curtilage* § 25 (1966) ("The trend of modern decisions, and especially in the United States, has been to enlarge the original meaning of this word, and to include therein any house near enough to the dwelling house to be within its protection *as part of the domestic economy of the family,* and to consider the same *as part of the dwelling house.*") (emphasis added).

The Supreme Court of the United States has delineated four factors for courts to employ in determining whether an area of land is within the curtilage of a house: (1) the area's proximity to the home; (2) whether the area and the house are in the same enclosure; (3) whether the area is being used for the intimate activities of the house; and (4) the steps taken by the resident to protect the area from observation by passers-by. *United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). The trial court did not err in finding that Mathew's house was not within the curtilage of the Havners'. While Mathew's house is only twenty feet away from the Havners', it is not within the same enclosure as the Havners. Nor do the Havners' use Mathew's house, let alone use the house for the intimate activities; and the Havners have taken no steps to protect Mathew's house from observation by passers-by. While connected by utility lines, there is no overhang or pathway connecting the two.

It is also highly improbable, though not impossible, for one house to be within another's curtilage. *See, e.g., Siebert v. Severino,* 256 F.3d 648, 653 (7th Cir.2001) (court accepts stipulation that barn sixty feet from house not within curtilage); *United States v. King,* 227 F.3d 732, 752–53 (6th Cir.2000) (basement for two-family duplex not curtilage of one of the units); *United States v. Brady,* 993 F.2d 177, 178 (9th Cir.1993) (outbuilding forty-five feet from house not within the curtilage). There must be some level of functional hierarchy between the houses. *See* 25 C.J.S. *Curtilage* § 25 (1966)

Because Mathew did not live in the same house as the Havners or within the curtilage of their home, he was not a resident of their household and, hence, was not covered by their homeowner's policy. The trial court's judgment awarding summary judgment to Mathew is reversed. Because there is no material issue of fact for the trial court to resolve, *cf. Hoffman,* 46 S.W.3d at 636, and Liberty Mutual is entitled to summary judgment, the case is remanded to the trial court with instructions to enter judgment in favor of Liberty Mutual. *See Easley v. Am. Family Mut. Ins. Co.,* 847 S.W.2d 811, 814 (Mo.App. 1992). *See also Shelter Gen. Ins. Co. v. Siegler,* 945 S.W.2d 24, 28 (Mo.App.1997).

All concur.