# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-1087

CHARLENE HARPER,

*Plaintiff-Appellant,*

*v.*

VIGILANT INSURANCE COMPANY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 01-cv-0554-MJR—**Michael J. Reagan**, *Judge.*

ARGUED SEPTEMBER 15, 2004—DECIDED DECEMBER 6, 2005

Before BAUER, COFFEY and KANNE, *Circuit Judges.*

COFFEY, *Circuit Judge.* Plaintiff-appellant, Charlene Harper, acting in the capacity of administrator of Jane Doe's ("Jane") estate, appeals an order of the district court granting summary judgment in favor of the defendant-appellee Vigilant Insurance Company ("Vigilant"). The district court found that Jane, as an assignee of John Doe's ("John") rights to sue Vigilant for bad faith failure to defend and indemnify, could not prevail because John was not a "resident" of his father's "household" under the terms of his father's homeowner's insurance policy. The trial court also concluded, in the alternative, that even if John was an insured under the policy, Harper had failed to

establish that Jane's injury occurred during the effective insurance policy coverage period. We affirm.

## I. BACKGROUND

John and Jane met in St. Louis, Missouri, in the spring or summer of 1987. Not long after meeting they began dating, and became sexually active somewhere in September or October of that year. While dating Jane, John lived with his mother at 5525 Wilson Avenue in St. Louis, Missouri, but occasionally visited his estranged father's lake house in Lake of the Ozarks, Missouri. He and Jane stayed at his father's lake house "maybe six times . . . a year" and he went there "pretty consistently" without Jane.[1]

Prior to, and throughout his relationship with Jane, John engaged in high-risk sexual behavior. Among other things, John admitted to having sexual encounters with numerous men as well as other women while contemporaneously having relations with Jane. In 1990, John's treating physician advised him to get tested for HIV, as the doctor suspected he was suffering from AIDS. However, throughout the period of time that he was dating Jane, John failed to seek or obtain a HIV test. In addition, John neglected to inform Jane of either his sexual behavior or his doctor's suspicion that he was suffering from AIDS. In 1991 John and Jane broke up, and in January of 1992, John tested positive for HIV. Just a few months later, in April of 1992,

---

[1] Other than John's statement that he went to the lake house "pretty consistently" throughout his life without Jane, the record is barren of any evidence which would allow us to ascertain how frequently John visited his father's lake home without Jane. We are also unable to determine from the record how long John stayed at the lake house when he visited either in the company of Jane or without her.

Jane discovered that she too was infected with the HIV virus.

In March of 1994, Jane filed suit against John in St. Clair County, Illinois, ("the St. Clair lawsuit") seeking recovery for bodily injury, pain and suffering, emotional distress, loss of income and medical expense based on John's alleged negligence, battery and intentional infliction of emotional distress in infecting her with the HIV virus. Specifically, Jane alleged *inter alia* that: (1) John "transmitted HIV [to her] when he knew or should have known he was infected with the communicable disease"; and (2) John had "failed to take adequate precautions to prevent himself from contract-ing HIV" after he had "engaged in high-risk [sexual] behav-ior" while simultaneously sleeping with Jane.

After the St. Clair lawsuit was filed, John made numer-ous demands[2] upon Vigilant—as his father's insurer—to defend and indemnify him in the St. Clair lawsuit, relying on four different homeowner's insurance policies issued to his father. The four Vigilant policies included: (1) Policy Number 5224-35-36—issued to John's mother and father for property located at 2100 South 59th Street in St. Louis, Missouri, effective from January 7, 1985, through January 7, 1986; (2) Policy Number 5228-68-33—issued to John's father for property located at 4390 Via Giudici Drive in St. Louis, Missouri, effective from September 15, 1985, through September 15, 1991; (3) Policy Number 5229-31-78—issued to John's father for Lot #4, Horseshoe Bend #9, Lake Ozark, Missouri, effective from October 23, 1985, through October 23, 1989 ("the lake house policy"); and (4) Policy Number 1060-24-3601—issued to John's father for the Via Giudici Drive address, effective from September 15, 1989, through September 15, 1991. After investigating and

_____

[2] Indeed, between 1994 and 1998, John made three separate requests on Vigilant to defend or indemnify him in the St. Clair lawsuit, each of which was denied.

reviewing each of the claims, Vigilant denied each request for coverage.[3]

During their investigation, Vigilant proceeded to conduct a number of depositions as well as serve informal interrogatories on John through his counsel. For example, on November 13, 1997, John participated in a deposition dealing with the St. Clair lawsuit and stated that his residence was 5525 Wilson Avenue, St. Louis, Missouri and added that he had lived at that location "all of [his] life." John also testified that he had never claimed any other residence as his own and that he owned no real estate and had not lived anywhere else for an extended period of time. In addition, in response to a letter requesting more information, dated June 9, 1998, John, through his counsel, stated that: (a) he never maintained a bedroom at his father's lake house and that he resided at his mother's home "all of [his] life"; (b) he did not keep personal belongings at the lake house; and (c) he listed his mother's address on his tax returns and other legal documents. After concluding their investigation, Vigilant made a final determination on August 13, 1998, and advised John that Vigilant was not obligated, under any of the policies, to defend him, stating that they would: "neither defend [n]or indemnify [him in] [the St. Clair lawsuit] or participate in any settlement."

On March 29, 1999, Jane and John entered into a confidential Settlement and Mutual Release ("the settlement agreement"), thus terminating the St. Clair lawsuit.[4] In the

---

[3] In refusing to defend or indemnify John in the St. Clair suit, Vigilant determined that they were not required to do so because "[t]he complaint [did] not allege any personal injury, bodily injury, or property damage" within the meaning of the policy.

[4] At some point in the litigation John also made a demand on his mother's insurer, State Farm Fire and Casualty Company
(continued...)

settlement agreement, in addition to consenting to the entry of judgment against him in the amount of $2,000,000, John also assigned to Jane[5] the right to pursue any bad faith or vexatious refusal to pay claims he accrued[6] against Vigilant

---

[4] (...continued)
("State Farm"), to defend him in the St. Clair lawsuit pursuant to a homeowner's insurance policy issued to John's mother for the 5525 Wilson Avenue property (where John was living at the time of the lawsuit). After first refusing to defend or indemnify, State Farm eventually agreed to settle a portion of the claim against John and pay Jane $100,000. In exchange, State Farm was granted a release from further liability to Jane under the policy.

[5] Bad faith claims against insurers are assignable under Missouri law. *See generally Freeman v. Brasso*, 128 S.W.3d 138, 141 (Mo. Ct. App. 2004); *accord Magers v. Nat'l Life & Accident Ins. Co.*, 329 S.W.2d 752, 756 (Mo. 1959) (en banc).

[6] Missouri law prescribes that: "If the person whose property or interest therein is injured is dead, the action survives and may be brought against the wrongdoer by the person appointed as fiduciary for the estate of the deceased person." Mo. Stat. § 537.010. In addition, as stated *supra* at p. 5 n.5, bad faith claims against insurers are assignable under Missouri law. *See Freeman*, 128 S.W.3d at 143. Accordingly, the assignment of John's right to sue Vigilant to Jane was valid and, upon her death, Mo. Stat. § 537.010 dictates that Jane's right to sue was, by operation of law, transferred to her "appointed fiduciary," in this case her sister, Harper. The only limitation placed on Jane's—and, by extension, the administrator of her estate, Harper's—right to sue would have been the Missouri statute of limitation, which bars actions in contract brought more than five years after they accrue. *See* Mo. Stat. § 516.120 (stating that "[a]ll actions upon contracts" shall be brought within five years). In any case, neither party has challenged either John's assignment of his right to sue Vigilant to Jane or Harper's filing of suit against Vigilant on Jane's behalf—and to do so now would be fruitless. *See Republic Tobacco*
(continued...)

for refusal to defend him in the St. Clair lawsuit. John died on November 24, 1999.

Pursuant to John's assignment of the right to sue, Jane filed a complaint against Vigilant on July 3, 2001, in St. Clair County, Illinois alleging: (1) bad faith refusal to defend; (2) bad faith refusal to settle; and (3) violation of section 155 of the Illinois Insurance Code, 215 ILCS 5/155. In response, Vigilant filed a motion with the circuit court seeking permission to remove the case to federal court pursuant to 28 U.S.C. § 1332. Vigilant's motion was granted and the case was removed to the United States District Court for the Southern District of Illinois. Jane subsequently died on October 19, 2001, while the case was pending. In February, 2002, Harper, Jane's sister and estate administrator, was substituted for Jane as the plaintiff in the pending suit.

Following discovery, Vigilant filed a motion for summary judgment against Harper, claiming that it had no duty to defend John in the St. Clair lawsuit because he was not an insured under the terms of any of his father's policies. Also, Vigilant argued that, even if John was an insured under any of the policies, there was no evidence in the record which would establish that John infected Jane during the effective time limits of the lake house policy. The district court agreed with Vigilant's arguments and entered summary judgment in the insurance company's favor on November 3, 2003, finding that John was not insured under the terms of any of Vigilant's policies issued to John's father and that, even if he were, there was no evidence establishing that Jane had been infected during the coverage periods

---

[6] (...continued)
*Co. v. North Atlantic Trading Co., Inc.*, 381 F.3d 717, 728 (7th Cir. 2004) (arguments not presented to the district court are deemed waived).

of the policies at issue. Harper appeals the judgment only with respect to Policy Number 5229-31-78, the lake house policy.

## II. ISSUES

On appeal, Harper argues that the district court erred in granting Vigilant's motion for summary judgment. Specifically, Harper claims that summary judgment was improper because: (a) Vigilant "failed to establish beyond dispute that [John] was not an insured person under the lake house policy because he 'never resided' at the vacation property" and (b) whether or not John infected Jane with the HIV virus at the vacation property was a disputed question of material fact.

## III. DISCUSSION

We review the district court's grant of summary judgment *de novo*, and in doing so view the record in the light most favorable to Harper, the nonmoving party. *See Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004). Summary judgment is warranted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "An issue of fact is 'material' if it is outcome determinative . . . [h]owever, 'bare allegations not supported by specific facts are not sufficient in opposing a motion for summary judgment.'" *Hottenroth*, 388 F.3d at 1027 (quoting *Hildenbrant v. Ill. Dept. of Natural Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003)).

As a federal court sitting in diversity by virtue of jurisdiction pursuant to 28 U.S.C. § 1332, we apply state law "to resolve substantive questions and federal law to resolve procedural and evidentiary issues." *Colip v. Clare*, 26 F.3d 712, 714 (7th Cir. 1994) (citing *Mercado v. Ahmed*, 974 F.2d 863, 866 (7th Cir. 1992)). In the district court proceedings, both parties "agree[d] that . . . the substantive law of the State of Missouri" would govern interpretation of the insurance contract at issue. *Harper v. Vigilant Ins. Co.*, No. 01-CV-554-MJR, at *7 (S.D.Ill. Nov. 3, 2003). Also, because the trial court proceeded to conduct an independent choice-of-law analysis and determined that Missouri law should apply to the interpretation of the insurance contract and because neither party has challenged that determination, they are barred from doing so now. *See id.* at *7-8; *Muslin v. Frelinghuysen Livestock Managers, Inc.*, 777 F.2d 1230, 1231 n.1 (7th Cir. 1985). Thus, under the familiar rule of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), we apply Missouri substantive law to the issues raised in this appeal.

Where the Missouri Supreme Court has not confronted a particular issue (e.g., whether the term "household" as used in an insurance contract is ambiguous), we are called upon to predict how that court would decide if presented with the same question. *See Smith v. Equitable Life Assurance Soc'y of the United States*, 67 F.3d 611, 615 (7th Cir. 1995). In the absence of a Missouri Supreme Court ruling on an issue, the decisions of the Missouri Court of Appeals will control unless there is persuasive evidence that the Missouri Supreme Court would rule differently. *See Clarin Corp. v. Mass. Gen. Life Ins. Co.*, 44 F.3d 471, 474 (7th Cir. 1994).

### A.  *John's possible coverage as a member of his father's household*

Harper initially argues that summary judgment in favor of Vigilant was inappropriate because whether John should

be considered a "resident" of his father's "household" for purposes of the lake house policy constituted a "genuine issue of material fact" pursuant to FED. R. CIV. P. 56(c). We disagree.

Under Missouri law, "[i]n general, the meaning of an insurance contract and, in particular, coverage is a question of law." *Liberty Mut. Ins. Co. v. Havner*, 103 S.W.3d 829, 832 (Mo. Ct. App. 2003). However, where a provision in an insurance policy is ambiguous or "susceptible to two or more meanings . . . , the court must adopt the meaning that is most advantageous to the insured's position." *Id*. The rationale underpinning this rule of law is that, "[i]n drafting insurance policies, the insurer 'has the opportunity to clearly word exclusions and limits of liability.'" *JAM Inc. v. Nautilus Ins. Co.*, 128 S.W.3d 879, 893 (Mo. Ct. App. 2004) (quoting *Southern General Ins. Co. v. WEB Assoc./Elec., Inc.*, 879 S.W.2d 780, 782 (Mo. Ct. App. 1994)).

The Missouri Supreme Court, to date, has not specifically addressed the question of whether the term "household" when left undefined in an insurance contract is considered ambiguous; however, in a 1979 en banc decision, the Missouri Supreme Court noted that "'[h]ousehold' is a chameleon like word . . . [t]he definition depends on the facts of each case . . . [i]t is difficult to deduce any general principles." *Cobb v. State Sec. Ins. Co.*, 576 S.W.2d 726, 738 (Mo. 1979) (en banc). Nonetheless, despite the Missouri Supreme Court's admonition in *Cobb*, the Missouri Court of Appeals for the Western District of Missouri undertook the near impossible task of actually defining the term "household," and having done so, declared the term unambiguous "within and for the purposes of 'homeowners' insurance policies." *Watt v. Mittlestadt*, 690 S.W.2d 807, 816 (Mo. Ct. App. 1985) (defining household as "a collection of persons, whether related by consanguinity or affinity or not related at all but who live or reside together as a single group or unit which is of a permanent and domestic character, with

one head, under one roof or within a single curtilage; who have a common subsistence and who direct their attention toward a common goal consisting of their mutual interest and happiness."). However, in 2003 the Missouri Court of Appeals for the Western District overruled its own decision in *Watt*, finding the definition unworkable and concluded that "[b]ecause the meaning of the court's definition is indistinct, [the term "houshold" as a matter of law] is ambiguous." *Liberty Mut. Ins. Co.*, 103 S.W.3d at 833 (citing *Martin v. U.S. Fid. & Guar. Co.*, 996 S.W.2d 506, 508 (Mo. 1999) (en banc)). Thus, due to the fact that the *Watt* court reversed itself, and because the Missouri Supreme Court has expressly described the term "household" when incorporated into a homeowner's insurance policy as "chamaeleon like" and dependant on the "facts of each case," *see Cobb*, 576 S.W.2d at 738, we conclude that, if the Missouri Supreme Court were to consider the issue, the court would conclude that the term "household" is indeed ambiguous. *See Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 681 n.11 (7th 2005).

Accordingly, because the term "household" as incorporated into the lake house policy is ambiguous, we interpret that term against the drafter, Vigilant, and in favor of coverage for the insured. *See Krombach v. Mayflower Ins. Co.*, 827 S.W.2d 208, 210 (Mo. 1992) (en banc).[7] Nevertheless, where "there is no coverage under any reasonable

[7] As the Missouri Supreme Court noted "[t]here are at least two reasons for this rule of construction. . . . First, insurance is designed to furnish protection to the insured, not defeat it. Ambiguous provisions of a policy designed to cut down, restrict, or limit insurance coverage already granted, or introducing exceptions or exemptions must be strictly construed against the insurer . . . . Second, as the drafter of the insurance policy, the insurance company is in the better position to remove ambiguity from the contract." *Id.* at 210-11 (internal citations omitted).

interpretation of . . . the policy" summary judgment in favor of the insurer, here Vigilant, is a proper remedy. *See Liberty Mut. Ins. Co.*, 103 S.W.3d at 833 (citing *Greer v. Zurich Ins. Co.*, 441 S.W.2d 15, 30 (Mo. 1969)).

This is such a case. Under any reasonable interpretation of the language in the insurance contract, John cannot be considered a "resident" of his father's "household."[8] The term "household", as determined by the Missouri Supreme Court, generally refers to "a close relationship, varying in detail, where people live together as a family in a closely-knit group, usually because of a close relationship by blood, marriage or adoption and who deal with each other informally and not at arms length." *Cobb*, 576 S.W.2d at 738; *cf. Elder v. Metro. Prop. & Cas. Co.*, 851 S.W.2d 557, 559-60 (Mo. Ct. App. 1993). In addition, the Missouri Courts of Appeals have expanded on this precedent holding that, in order to be a "resident" of an insured's "household," an individual must establish that his stay in the insured's home was intended to be " 'something of permanence or continuity at least for an indefinite period [of time], to the exclusion of another contemporaneous residence." *Pruitt v. Farmers Ins. Co.*, 950 S.W.2d 659, 664

---

[8] The lake house policy provided liability insurance for John's father and his "relatives" only if they were "residents of [his] household." The language of the policy neither defines "relatives" nor does it define "residents of [his] household." Vigilant does not dispute that John was a relative of his father. The question is whether John's infrequent social visits to his father's lake house during the effective policy period qualified him as a "resident of [his father's] household," thereby granting him insured status under the policy. Under Missouri law, Harper has the burden of establishing that John was an insured under the lake house policy, a burden which she has failed to carry. *See Shelter General Ins. Co. v. Siegler*, 945 S.W.2d 24, 27 (Mo. Ct. App. 1997); *see also Auto. Club Inter-Ins. Exch. v. Medrano*, 83 S.W.3d 632, 638 (Mo. Ct. App. 2002).

(Mo. Ct. App. 1997) (quoting *Clarkson v. MFA Mut. Ins. Co.*, 413 S.W.2d 10, 13 (Mo. Ct. App. 1967)).[9]

During the time frame at issue, John neither lived with his father in a "close-knit group" nor did he fulfill the requirement of maintaining a permanent continuity of existence at his father's lake house "to the exclusion of another contemporaneous residence." Indeed, there is no evidence which would lead us to believe that John's visits to his father's lake house were of a permanent nature or that John at any point intended to establish a residence at the lake house or remain as a member of his father's family—to the exclusion of his mother's residence in St. Louis. For example, in a deposition taken in conjunction with the St. Clair lawsuit John stated that his residence was 5525 Wilson Avenue in St. Louis and that he had resided there "all of [his] life."[10] In addition, John designated the St. Louis address on a number of legal documents, such as tax returns and "all other applications." Although John admits visiting his father's lake house with Jane "maybe six times a year," and "pretty consistently" at other times throughout his life, there is no evidence in the record which would demonstrate that John's living arrangements consisted of more than intermittent social visits to the lake house, while his permanent home remained in St. Louis with his mother. Further, in responding to a questionnaire provided to him by Vigilant, John stated that he did not maintain a bedroom at the lake home, nor did he keep any of his personal

---

[9] The term "residence" has been defined by the Missouri Courts of Appeals as a "person's physical location coupled with his intent to remain there for an indefinite period of time." *American Family Mut. Ins. Co. v. Auto. Club Inter-Ins. Exch.*, 757 S.W.2d 304, 306 (Mo. Ct. App. 1988).

[10] John lived at the St. Louis address with his mother and father until his parents' separation and, after his father moved out, continued living at the house with his mother.

possessions at the lake home. Thus, although the question of whether a person is a "resident" of an insured's "household" under the language of an insurance policy is a question of fact, *Liberty Mutual Insurance Co. v. Havner*, 103 S.W.3d 829, 832 (Mo. Ct. App. 2003), the evidence in the record fails to establish a genuine issue of material fact as to whether John was an insured and, as such, the district court properly granted summary judgment in favor of Vigilant, *see Cameron Mutual Insurance Co. v. Marler, et al.*, 926 S.W.2d 62, 65 (Mo. Ct. App. 1996).

## B.  John's potential coverage as a an officer or employee of his father's company

In a related, but poorly developed argument, Harper also argues that John was an insured under the lake house policy by virtue of his employment with Crescent Parts & Equipment ("Crescent"), his father's company. The record establishes that Harper failed to properly present this argument to the district court, aside from stating—in her brief challenging summary judgment—that "[t]he lake house policy was issued to Mr. Doe's father and Crescent Parts & Equipment Company." Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, p. 13. Accordingly, because Harper failed to properly present the issue to the district court in response to Vigilant's motion for summary judgment, that issue is waived. *See Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 728 (7th Cir. 2004) (quoting *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996)).

In addition to waiving the argument in the district court, Harper also failed to address the issue on appeal aside from stating that "[t]he coverage provided to [John's] employer under the policy would be rendered illusory if it extended only to those meeting the definition now proposed by Vigilant Insurance Company." The argument is more

developed in Harper's reply brief, but this is too little, too late, for "[a]rguments raised for the first time in a reply brief are [also] waived*." James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998); *see Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 665 (7th Cir. 2005); *United States v. Spaeni*, 60 F.3d 313, 317 (7th Cir. 1995); *see also Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 586 (7th Cir. 1999) (failure to develop an argument until the moment of no return, i.e., the filing of a reply brief, constitutes waiver).

Nevertheless, even if we were to assume *arguendo* that the issue was not waived, Harper's argument that Crescent—and by extension John—was an insured under the lake house policy is unsupported either with facts in the record or the required case law applicable thereto. The only evidence Harper offers in support of her contention that Crescent was a named insured under the lake house policy is the inclusion of the following language under the mailing address heading of the policy: "[John's father] % Crescent Parts & Equipment." Harper avails herself of this alleged ambiguity to argue in her reply brief that the existence of the "%" symbol creates an ambiguity in the contract as to whether Crescent was a named insured, and that under Missouri law we must therefore interpret the ambiguity in favor of the insured. *See Harrison v. Tomes*, 956 S.W.2d 268, 270 (Mo. 1997) (en banc). One problem with this unsupported, yet creative argument is that Harper has failed to supply this court with *any* precedential support for the proposition that a mailing address could ever create an additional named insured, where that party is not a named insured anywhere else in the underlying contract. *Cf. Prestigiacamo v. American Equitable Assurance Co. of N.Y.*, 221 S.W.2d 217, 218-23 (Mo. Ct. App. 1949).[11] Also, even if

---

[11] In addition, it should be noted that Crescent is not listed in
(continued...)

it were reasonable to conclude, which it is not, that the mailing address created a patent ambiguity in the contract and that, by virtue of the ambiguity Crescent should be considered an insured under the lake house policy, Harper's claims still must fail. This is because John, as an officer and employee of Crescent,[12] cannot be considered an insured under any "reasonable interpretation of the [lake house] policy." *See Liberty Mut. Ins. Co.*, 103 S.W.3d at 833. The general rule in Missouri, as well as other jurisdictions, is that under insurance liability policies, when a corporation is exclusively listed as the named insured on the policy, the corporation's shareholders, officers, and employees are not considered additional insureds under the policy unless the policy specifically provides otherwise. *See Ott v. Firemen's Fund Ins. Co.*, 936 S.W.2d 165, 166 (Mo. Ct. App. 1996); *Guarantee Ins. Co. v. Anderson*, 585 F.Supp. 408, 411 (E.D. Pa. 1984); *Young v. Ray America, Inc.*, 673 S.W.2d 74, 79 (Mo. Ct. App. 1984); *see also* Couch on Insurance § 40:15 ¶3 (3d ed. 2005) ("A liability policy on a corporate entity does not automatically cover its employees or members.").[13]

---

[11] (...continued)
the specific section of the insurance contract entitled "Additional Insured."

[12] In deposition testimony John stated that he was both an officer and employee of Crescent. Specifically, John stated that he held the executive title of "perhaps secretary, treasurer, something along those lines," and contemporaneously acted as a "product manager."

[13] Even if Crescent were covered by a commercial general liability policy, coverage would only extend to officers and employees acting "within the scope of [their] authority or employment." *Maryland Cas. Co. v. Huger*, 728 S.W.2d 574, 579 (Mo. Ct. App. 1987); *see Aetna Cas. & Sur. Co. v. Pavlovitz*, 826 S.W.2d 362, 366-67 (Mo. Ct. App. 1992); *see* Judge Almon H. Maus, Missouri Practice Series: Insurance Law and Practice § 10.20 (West 1997);
(continued...)

Thus, because we hold that the issue of whether John was an insured as an officer or employee of Crescent was waived by Harper when she failed to sufficiently raise it either in the district court or on appeal, and because the argument is without merit as set forth herein, we need not consider it further and conclude that such an argument would not have precluded the district court from properly granting Vigilant's motion for summary judgment.

## C. Whether Jane was infected during the applicable insurance policy coverage period

Because we hold that John was not an insured under the terms of his father's lake house policy, we need not address Harper's argument that there was a dispute as to a question of material fact regarding the question of whether John infected Jane with the HIV virus during the effective policy period of the lake house insurance contract.[14]

---

[13] (...continued)

Couch on Insurance § 126:7 (3d ed. 2005). Neither party alleged that the lake house policy constituted a general liability policy; therefore, even if Crescent were an insured, John as an officer and/or employee would not have been covered under the policy. *See id.* What's more, Harper does not argue, nor could she argue, that John's alleged negligent acts occurred while he acting "within the scope of his authority or employment." *Maryland Cas. Co.*, 728 S.W.2d at 579.

[14] Also, because we have found that John was not an insured under the lake house policy and, therefore, Vigilant owed no duty to defend John in the St. Clair lawsuit, we need not analyze Harper's claim that Vigilant violated section 155 of the Illinois Insurance Code, as an essential element of that claim is that Vigilant had a duty to defend John. *See Yamada Corp. v. Yasuda Fire and Marine Ins. Co.*, 712 N.E.2d 926, 931 (Ill. App. 1999).

## IV. CONCLUSION

The decision of the district court is

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—12-6-05