JAM INC., et al., Respondent,

v.

NAUTILUS INSURANCE COMPANY,
Appellant.

No. WD 61603.

Missouri Court of Appeals,
Western District.

March 23, 2004.

Michael D. Hufft, Kansas City, MO, for appellant.

Gerald L. Thompson, Kansas City, MO, for respondent.

Before HARDWICK, P.J., BRECKENRIDGE and SPINDEN, JJ.

PATRICIA BRECKENRIDGE, Judge.

Nautilus Insurance Company appeals a jury verdict in favor of John Perrett on his claim for breach of an insurance contract and vexatious refusal to pay under the insurance contract for his loss due to an apartment building fire. Nautilus refused to pay under the insurance contract because, at the time of the fire, the apartment building was owned by JAM, Inc., but the insurance policy was in the name of Mr. Perrett, the president and a shareholder of JAM, Inc. Nautilus raises four points on appeal. In its first three points, Nautilus claims that the trial court erred in denying its motion for directed verdict and judgment notwithstanding the verdict, because Mr. Perrett did not make a submissible case that (1) he had an insurable interest in the apartment building; (2) he had a financial interest in the apartment building at the time of the fire; and (3) Nautilus' refusal to pay under the policy was willful and without reasonable cause such that it was liable for vexatious refusal to pay. In its fourth point, Nautilus asserts that the trial court erred in denying its motion for new trial because the damages awarded by the jury were excessive and not supported by the evidence. This court finds that Mr. Perrett had an insurable interest and a financial interest equal to the entire amount of coverage on the property because he agreed with the other shareholders to obtain insurance for the benefit of the corporation and his failure to obtain proper insurance rendered him susceptible to pecuniary harm in the event of a loss. Because the loss to the apartment building was only partial, however, Mr. Perrett's damages were limited to the difference between the fair market value of the building before and after the loss and could not be based on the cost to repair. This court further finds that Mr. Perrett made a submissible case for damages for vexatious refusal to pay. Accordingly, the actual damages award is reversed, in part, and remanded. The judgment is affirmed in all other respects.

**Factual and Procedural Background**

On review, this court views the evidence and any reasonable inferences therefrom in the light most favorable to the jury's

verdict and disregards any contrary evidence. *Massman Constr. Co. v. Mo. Highways & Transp. Comm'n,* 31 S.W.3d 109, 112 (Mo.App.2000). The facts in that light are that Mr. Perrett, a resident of Salem, Utah, is employed by the State of Utah Social Services. In 1995, he and one of his co-workers, Ana Manent, attended a real estate purchasing seminar. The seminar's sponsor organized groups of people interested in investing in real estate and took the groups to different parts of the country to show them available properties. At that time, Ms. Manent. had already taken one of these trips and had purchased an apartment building at 4057 Warwick in Kansas City for $60,000. Ms. Manent paid $12,000 as a down payment on the building, and the building's seller, Stephen Brock, carried back a mortgage for the remaining $48,000.

Mr. Perrett and Ms. Manent decided to become partners in owning this apartment building, so Mr. Perrett paid Ms. Manent $6,000 as his share of the down payment. The apartment building was uninhabitable at the time, so Mr. Perrett and Ms. Manent each contributed to the $8,000 in expenses and effort to bring the property to a condition that would enable them to rent the property. Ms. Manent hired Select Properties Ltd. to manage the apartment building. Select Properties' duties included collecting the rents, making repairs, paying the mortgage, and paying for insurance. At that time, the property was insured through Northwestern National Insurance Company in Mr. Perrett's and Ms. Manent's names.

A couple of months later, another of Mr. Perrett and Ms. Manent's co-workers, Mary Baldwin, decided that she, too, wanted to be involved in owning the apartment building. Ms. Baldwin paid $4,000 to join the group. On February 28, 1996, Mr. Perrett, Ms. Manent, and Ms. Baldwin incorporated in Utah as JAM, Inc. Each became a one-third owner of the corporation. Because Mr. Perrett had the most experience with rental property, the group decided that he would be JAM, Inc.'s president. Ms. Baldwin was appointed vice-president, and Ms. Manent was appointed secretary and treasurer of JAM, Inc. because, at that time, Ms. Manent was keeping track of the apartment building's income and expenses, disseminating information, and writing checks. Ms. Manent conveyed the apartment building to JAM, Inc. by quitclaim deed on May 15, 1996. The apartment building was the corporation's only asset. The corporation never issued stock certificates, nor did it have any savings or checking accounts.

In November 1996, Ms. Manent moved to Georgia, but continued to be involved in JAM, Inc. In January 1997, there was a fire in the apartment building. Northwestern National paid Mr. Perrett $5,000 for the partial loss to the building. Mr. Perrett deposited the $5,000 into his checking account and made arrangements with Select Properties to have the property repaired for that amount. Shortly after the fire, Ms. Manent decided that she no longer wanted the responsibility of dealing with Select Properties on behalf of the corporation, so she asked Mr. Perrett to take over her duties. Mr. Perrett agreed, and began receiving statements from Select Properties. Mr. Perrett became responsible for dealing with Select Properties, disseminating information about the property to Ms. Manent and Ms. Baldwin, distributing profits, and dividing expenses.

Sometime later in 1997, Northwestern National canceled the insurance policy on the property. Ms. Manent, Ms. Baldwin, and Mr. Perrett agreed it was Mr. Perrett's responsibility to obtain new insurance on the property for JAM, Inc. Mr.

Perrett told Ms. Manent and Ms. Baldwin that he would obtain insurance on the property for the benefit of the corporation. To fulfill this obligation, Mr. Perrett contacted Select Properties and instructed them to obtain a policy on the apartment building to insure it for its replacement value.

Select Properties faxed a request for a quote to insure the property to Sharon Javinsky of Encore Insurance Agency. In the request, Select Properties told Ms. Javinsky that it did not have any previous insurance information on the property, and that if Ms. Javinsky had any questions, to "contact the owner—John Parrot." After Ms. Javinsky faxed a list of questions concerning the building's age, composition, occupancy, and square footage back to Select Properties, Select Properties responded with answers to some of the questions and explained that the answers were "to the best of our ability—more details & you'll have to call the owner." Ms. Javinsky sent the information on to Glenda Dowell, who worked for Chris–Leef Insurance Agency as an underwriter. Chris–Leef Insurance Agency acted as Nautilus' agent, and underwrote policies for Nautilus. Ms. Dowell needed additional information about the property so, on December 24, 1997, Ms. Javinsky called Mr. Perrett, in Utah, two times. During one of those conversations, Ms. Javinsky asked Mr. Perrett who owned the building. Mr. Perrett told Ms. Javinsky that he did. Ms. Javinsky sent the information on to Ms. Dowell. Later that day, Ms. Dowell faxed a binder of insurance to Ms. Javinsky binding Nautilus to provide commercial property and general liability insurance on the apartment building. The binder of insurance listed Select Properties as the applicant. On January 8, 1998, Ms. Javinsky sent a fax to Select Properties advising that, effective December 24, 1997, Encore Agency had "bound building, rents and liability coverage on the subject location as a result of ... direct conversations and authorization of John Parrot."

Several months later, Encore Agency faxed a partially-completed commercial insurance application to Select Properties to review and sign. In the section entitled "Applicant Information," the application listed "Select Properties, Ltd.; John Parrot" and checked boxes marked "Partnership" and "Individual." In the section entitled "Nature of Business/Description of Operations by Premise(s)" the application listed "Ownership and management of (5) unit habitational building" "Select Properties, Ltd.——Management" and "John Parrot—Owner." In the space marked "Applicant's Signature," Select Properties signed it as "Select Properties agent for Parrot." Encore also faxed an invoice for the policy premium to Select Properties. Select Properties sent the invoice to Mr. Perrett, who paid the premium and sent copies of the invoice to Ms. Manent and Ms. Baldwin. On their copies, Mr. Perrett indicated what a third of the premium would be.

The commercial property insurance policy through Nautilus provided replacement coverage for the apartment building up to a limit of $100,000, and coverage for debris removal up to a limit of $5,000. The term of the initial policy was December 24, 1997, to December 24, 1998. In 1998, Mr. Perrett renewed the policy for another year, extending coverage to December 24, 1999.

Sometime in early 1999, Ms. Manent decided that she was "burnt out" with her investment in JAM, Inc. and the apartment building. She and Mr. Perrett discussed his buying her out of her interest in the corporation and the apartment building. In February 1999, Mr. Perrett entered into a contract to sell the apartment building to another party for $86,000. On

May 1, 1999, JAM, Inc. was involuntarily dissolved. On May 22, 1999, there was a fire at the apartment building. The cost to repair the apartment building was $115,167.81, and the estimated cost of debris removal was over $7,000.

After the fire, Ms. Manent and Ms. Baldwin sold their interests in the apartment building and JAM, Inc. to Mr. Perrett. Ms. Manent sold her interest on May 28, 1999, and Ms. Baldwin sold her interest on June 9, 1999.

One day after the fire, Ms. Dowell of the Chris–Leef Insurance Agency was notified of the loss. At that time, Ms. Dowell was also notified that there were multiple owners of the property and that Mr. Perrett had "bought out [his] partners." A property loss notice concerning the apartment building fire was sent to Ms. Dowell on June 7, 1999. Ms. Dowell sent the notice on to Nautilus the next day. Nautilus hired an independent adjuster to investigate the claim.

On January 4, 2000, Mr. Perrett submitted a sworn proof of loss statement to Nautilus demanding payment of the policy limits. Four months later, Nautilus sent Mr. Perrett a letter, dated April 24, 2000, denying Mr. Perrett's claim. In the letter, Nautilus said that it was denying the claim because it believed Mr. Perrett did not have an insurable interest in the apartment building at the time the policy was issued nor at the time of loss. According to Steven P. Johnson, a senior claims representative with Nautilus, the insurance company believed that Mr. Perrett was "nothing more than a shareholder" of a one-third interest in the corporation that owned the apartment building and, since he was not the title owner of the property, he did not have an insurable interest in the property. Moreover, Nautilus determined that the policy in Mr. Perrett's name was void because he had misrepresented his ownership interest in the property. Although it denied Mr. Perrett's claim, Nautilus offered "to satisfy all of the claims of Mr. Perrett, Select Properties, Inc, Mary Baldwin, Ana Manent and JAM, Inc." for $39,333. On June 1, 2000, Nautilus returned the balance of the insurance premium to Mr. Perrett. Mr. Perrett did not cash the check.

On September 26, 2000, JAM, Inc. and Mr. Perrett sued Nautilus for breach of the insurance contract and vexatious refusal to pay under the insurance contract. A jury trial was held from March 5 to March 7, 2002. At the close of JAM, Inc. and Mr. Perrett's evidence, the trial court granted Nautilus' motion for directed verdict as to JAM, Inc. On March 7, the jury returned a verdict for Mr. Perrett and awarded him $105,000 on the policy, $5,000 for penalty, and $25,000 for attorney's fees. The trial court also awarded Mr. Perrett $20,505.18 in prejudgment interest from January 4, 2000, to March 7, 2002. On April 12, 2002, Nautilus filed a motion for judgment notwithstanding the verdict or for a new trial, which the trial court denied. This appeal followed.

## Standard of Review

In three of its four points on appeal, Nautilus claims that the trial court erred in denying its motion for directed verdict and its motion for judgment notwithstanding the verdict. The standards of review for the denial of a motion for directed verdict and the denial of a motion for judgment notwithstanding the verdict are "essentially" the same. *Giddens v. Kansas City S. Ry. Co.*, 29 S.W.3d 813, 818 (Mo. banc 2000). The review consists of determining whether the non-movant made a submissible case. *Massman Constr. Co.*, 31 S.W.3d at 112. This court will not find the evidence insufficient unless "'there is a "complete absence of pro-

bative fact" to support the jury's conclusion.'" *Id.* (quoting *Seitz v. Lemay Bank & Trust Co.*, 959 S.W.2d 458, 461 (Mo. banc 1998) (citation omitted)). "When reasonable minds can differ on a question put to a jury, the court may not disturb the jury's verdict." *Id.*

## Mr. Perrett Had an Insurable Interest in the Apartment Building

In its first point, Nautilus claims that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict because the evidence did not show that Mr. Perrett had an insurable interest in the apartment building at the time the insurance policy was issued and renewed, or at the time of fire. Thus, Nautilus argues that Mr. Perrett failed to make a submissible case to recover under the insurance policy.

■■■ "To recover under a fire insurance policy, a claimant must establish (1) that the insurance company issued its policy to the claimant on the property covering loss due [to] fire; (2) that such property was damaged by fire; and (3) that the policy was in force on the date of the fire." *Travers v. Universal Fire & Cas. Ins. Co.*, 34 S.W.3d 156, 160 (Mo.App.2000). In addition, "the insured must have an insurable interest in the property both at the time the insurance contract is made and at the time the loss is sustained." *Dimmitt v. Progressive Cas. Ins. Co.*, 92 S.W.3d 789, 792 (Mo. banc 2003). An insurable interest is based upon the insured's pecuniary relationship to the property:

"In general, a person has an insurable interest in the subject matter insured where he has such a relation or concern in such subject matter that he will derive pecuniary benefit or advantage from its preservation, or will suffer pecuniary loss or damage from its destruc-

tion, termination, or injury by happening of the event insured against."

*G.M. Battery & Boat Co. v. L.K.N. Corp.*, 747 S.W.2d 624, 626 (Mo. banc 1988) (citation omitted).

■■■ An insurable interest "'may be a special interest entirely disconnected from any title, lien, or possession.'" *DeWitt v. Am. Family Mut. Ins. Co.*, 667 S.W.2d 700, 705 (Mo. banc 1984) (citation omitted). Thus, an insurable interest is not dependent upon the insured having title to the property, but instead "'may be derived from possession, enjoyment, or profits of the property, security or lien resting upon it, or it may be other certain benefits growing out of or dependent upon it.'" *Id.* (citation omitted). Moreover, to be an insurable interest, the interest need not "'be such that the event insured against would necessarily subject the insured to loss; it is sufficient that it might do so, and that pecuniary injury would be the natural consequence.'" *G.M. Battery*, 747 S.W.2d at 626 (citation omitted). Courts "make every effort to find insurable interest, and to sustain coverage, when there is any substantial possibility that the insured will suffer loss from the destruction of the property." *Id.* at 627.

■■ Nautilus asserts that Mr. Perrett did not make a submissible case to recover under the insurance contract because he did not demonstrate that he had an insurable interest in the apartment building at the time the insurance policy was issued and at the time of the fire. Nautilus contends that Mr. Perrett did not have an insurable interest in the apartment building because the building was owned by JAM, Inc., and Mr. Perrett was just "one of three minority shareholders" in JAM, Inc. Nautilus argues that a shareholder of a corporation cannot have an insurable interest in property owned by the corporation.

Nautilus' argument is directly contrary to *Berry v. Federal Kemper Insurance Co.*, 621 S.W.2d 948, 951 (Mo.App.1981), a case from the Southern District of this court that specifically held that a shareholder has an insurable interest in corporate property. This holding is consistent with the definition of "insurable interest," in that a shareholder has such a relation or concern in corporate property that the shareholder will derive pecuniary benefit from its preservation, or will suffer pecuniary loss from its destruction. *See G.M. Battery*, 747 S.W.2d at 626. Indeed, the rule that a shareholder has an insurable interest in corporate property has been recognized by several other states that have dealt with this issue, including Alabama, California, Colorado, Illinois, Indiana, Iowa, New York, Oregon, Tennessee, Texas, Virginia, Washington, and Wisconsin.[1] Thus, Mr. Perrett, as a shareholder of JAM, Inc., has an insurable interest in the apartment building.

Several of the cases from other states have held that the shareholder's insurable interest in corporate property is equal to the amount of the shareholder's actual interest in the corporation. *See, e.g., Aetna Ins. Co. v. Kennedy*, 161 Ala. 600, 50 So. 73, 74 (1909); *Warren*, 31 Iowa 464, 1871

WL 256, at *4; *St. Paul Lloyd's Ins. Co. v. Fong Chun Huang*, 808 S.W.2d 524, 527 (Tex.Ct.App.1991); *Nat'l Grocery Co. v. Kotzebue Fur & Trading Co.*, 3 Wash.2d 288, 100 P.2d 408, 416 (1940). It is not necessary for this court to decide, however, whether Mr. Perrett's insurable interest as a shareholder is equal to the amount of his actual interest in the corporation, which is one-third. This is because Mr. Perrett has another insurable interest, besides that of a shareholder, in the property.

■ Specifically, Mr. Perrett has an insurable interest in the property because, at both the time of the issuance and renewal of the policy and the time of the loss, it was solely his responsibility to procure property insurance on the building for the benefit of the corporation, and he verbally promised Ms. Manent and Ms. Baldwin that he would do so. This court has recognized that where a party has a contractual obligation with the property owner to maintain insurance for the full value of the property, the party's "subsequent risk of loss for any failure to maintain the insurance may well have created an insurable interest in the [party] for the policy limits." *Gorman v. Farm Bureau*

1. *See Aetna Ins. Co. v. Kennedy*, 161 Ala. 600, 50 So. 73, 74 (1909); *Richter v. Blasingame*, 110 Cal. 530, 42 P. 1077, 1078 (1895); *Helvetia Swiss Fire Ins. Co. v. Edward P. Allis Co.*, 11 Colo.App. 264, 53 P. 242, 246 (1898); *Welch v. N. Assurance Co., Ltd., of London*, 223 Ill.App. 77, 1921 WL 1896, at *3 (1 Dist. 1921); *Kothe v. Krag–Reynolds Co.*, 20 Ind. App. 293, 50 N.E. 594, 599 (1898); *Brown Township Mut. Ins. Ass'n v. Kress*, 330 N.W.2d 291, 297 (Iowa 1983); *Warren v. Davenport Fire Ins. Co.*, 31 Iowa 464, 1871 WL 256, at *4 (Iowa 1871); *Riggs v. Commercial Mut. Ins. Co.*, 125 N.Y. 7, 25 N.E. 1058, 1060 (1890); *Fenter v. Gen. Accident Fire & Life Assurance Corp.*, 258 Or. 545, 484 P.2d 310, 313 (1971); *Am. Indem. Co. v. S. Missionary Coll.*, 195 Tenn. 513, 260 S.W.2d 269, 272

(1953); *St. Paul Lloyd's Ins. Co. v. Fong Chun Huang*, 808 S.W.2d 524, 527 (Tex.App.1991); *Pac. Fire Ins. Co. v. John E. Morris Co.*, 12 S.W.2d 971, 971 (Tex. Comm'n App.1929); *Liverpool & London & Globe Ins. Co., Ltd. v. Bolling*, 176 Va. 182, 10 S.E.2d 518, 520 (1940); *Nat'l Grocery Co. v. Kotzebue Fur & Trading Co.*, 3 Wash.2d 288, 100 P.2d 408, 416 (1940); *Heyden v. Safeco Title Ins. Co.*, 175 Wis.2d 508, 498 N.W.2d 905, 908 (Ct. App.1993), *overruled on other grounds by Weiss v. United Fire & Cas. Co.*, 197 Wis.2d 365, 541 N.W.2d 753, 759 (1995). *See also;* 4 JOHN ALAN APPLEMAN ET AL., INSURANCE LAW & PRACTICE section 2145 (1969); 3 LEE R. RUSS, COUCH ON INSURANCE section 42:10 (3d ed.1997); 39 A.L.R.2d 723, 724, 1955 WL 10222 (1955).

*Town & Country Ins. Co. of Mo.*, 977 S.W.2d 519, 526 (Mo.App.1998).

In *Gorman*, a partnership comprised of the Gormans and Appelson purchased property. *Id.* at 520. The Gormans purchased a fire insurance policy on the property. Several years later, the Gormans quitclaimed their one-half interest in the property to Appelson in exchange for a promissory note secured by a deed of trust on the house. The Gormans did not inform the insurance company of the sale, nor did they transfer the insurance coverage to Appelson. *Id.*

After the property was destroyed by fire, the Gormans made a demand on the insurance company for the policy limits. *Id.* at 521. The basis for their claim was their assertion that when they sold their interest to Appelson, they entered into an oral agreement with him to maintain the insurance coverage for the full value of the property. The insurance company, however, tendered a check for only the amount of the Gormans' mortgage interest in the property. *Id.* On appeal, this court held that if the evidence proved that the Gormans "did have a contractual obligation to Appelson to maintain insurance on the property for the full value of the property, their subsequent risk of loss for any failure to maintain the insurance may well have created an insurable interest in the respondents for the policy limits." *Id.* at 526.

Other states have also recognized that an insurable interest arises by virtue of an agreement to insure the property. In *Luchansky v. Farmers Fire Insurance Co.*, 357 Pa.Super. 136, 515 A.2d 598, 599 (1986), parents had conveyed legal title of their property to their son, intending for the son to convey the property back to them when the mortgage was paid off or the property sold. During the time that the son had legal title to the property, the parents agreed to maintain insurance on the property and pay the insurance premiums. The court found that the parents had an insurable interest in the property by virtue of their agreement to maintain insurance on the property. *Id.* at 600. Specifically, the court held that whether the parents' maintaining the fire insurance protection was done "by the parents pursuant to the terms of the agreement or merely on behalf of their son as agents, they had an insurable interest in the property." *Id.* The court based its holding on the principle that " '[o]ne who makes a legally enforceable agreement to obtain insurance on property for the benefit of another has an insurable interest supporting a contract of insurance of the property even in his own name.' " *Id.* (citation omitted). The court also noted that the parents had managed the property in the son's absence by collecting rents and making repairs and, as such, "were in a position in which they derived a benefit from the property's existence and would suffer a loss from its destruction." *Id.*

The insured's managerial responsibility with regard to property, including the maintenance of insurance, was also sufficient to constitute an insurable interest in the property in *Collins v. Quincy Mutual Fire Insurance Co.*, 297 N.C. 680, 256 S.E.2d 718, 721–22 (1979). In *Collins*, the insured held rental property as co-tenants in common with two others. *Id.* at 719. The insurer had no notice, before the loss, that the insured was only a co-tenant in the property and was acting on behalf of his co-tenants when he obtained the insurance policy. *Id.* at 720.

In determining whether the insured had an insurable interest in the entire property, the court discussed the relationship between joint owners of property:

[I]t is not unusual, among joint owners of property, to leave the responsibility

for management of the property to one of the owners. Generally, authority to take charge of property includes authority to take reasonable measures to protect the property against destruction or loss, to keep it in reasonable repair and if the property is of the kind which is ordinarily insured, to insure it.

*Id.* at 721. Because of this relationship between joint owners of property, the court held that, "absent fraud or material misrepresentation," the language limiting the insurer's liability to the "interest of the insured" was "broad enough to cover the entire property which is insured by one co-tenant, acting as agent, for the benefit of all the owners." [2] *Id.* The court explained that its interpretation of the policy did not "increase the risk assumed by the insurance company," as the insured "sought protection for the full value of the rental property," "paid premiums on the assumption that the property was fully covered," and the insurance company "contracted to insure the property for full value to the extent of [the insured]'s interest." *Id.*

In this case, the evidence, in the light most favorable to the verdict, was that at some point in 1997, prior to Mr. Perrett's obtaining the insurance policy through Nautilus, Mr. Perrett had agreed with Ms. Manent to take over her managerial duties with regard to the property. By taking over her duties, Mr. Perrett became responsible for dealing with and directing the management company, Select Properties, on the corporation's behalf. For example, the insurance proceeds from the January 1997 fire were deposited into Mr. Perrett's checking account, and it was Mr. Perrett who made arrangements with Select Properties to have the property repaired. When the insurance company that was insuring the property canceled its policy in 1997, all three of JAM, Inc.'s owners—Mr. Perrett, Ms. Manent, and Ms. Baldwin—considered it Mr. Perrett's responsibility to obtain new insurance on the property. Moreover, Mr. Perrett testified that he made a verbal agreement with Ms. Manent and Ms. Baldwin to obtain insurance on the property for the benefit of the corporation. To fulfill this obligation, Mr.

**2.** The court in *Collins* noted that the insurer did not allege fraud or misrepresentation of any material fact, but if the insurance had been procured by "fraud or misrepresentation of a material fact, [the insurer] would have been protected by the standard policy provisions of G.S. 58–176." *Collins*, 256 S.E.2d at 721. The standard policy provisions to which the court was referring, now found in N.C. Gen.Stat. section 58–44–15 (2000), provide that the "entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto." The insurance policy in this case similarly provided that the policy was void if Mr. Perrett "intentionally conceal[ed] or misrepresented a material fact concerning ... [his] interest in the Covered Property[.]" On appeal, Nautilus relies on this provision to argue that a material misrepresentation by

Mr. Perrett negates his insurable interest in the property. The plain language of the provision clearly states a material misrepresentation voids the policy, however. The language does not state that a misrepresentation negates the insurable interest. This interpretation is consistent with the position Nautilus took at trial on this issue. At Nautilus' request, the jury was instructed that even if it found that Mr. Perrett had an insurable interest in the property, its verdict must be for Nautilus if it found that Mr. Perrett and Select Properties made a material misrepresentation on the insurance application, or that Mr. Perrett made material misrepresentations on the proof of loss statement. The jury's verdict in favor of Mr. Perrett indicates that it rejected Nautilus' argument that Mr. Perrett made any material misrepresentations and, therefore, the policy was void. Nautilus does not appeal the jury's finding on this issue in its points relied on, so the finding that Mr. Perrett did not make a material misrepresentation is conclusive.

Perrett instructed Select Properties to obtain a policy on the apartment building that would insure it for its replacement value.

This evidence established that both at the time of the issuance and renewal of the policy and at the time of the loss, Mr. Perrett was acting as the managing agent for JAM, Inc., and its shareholders. In that capacity and as a result of his verbal agreement with Ms. Manent and Ms. Baldwin, Mr. Perrett became responsible for obtaining insurance on the property for the benefit of the corporation. Mr. Perrett's undertaking of this responsibility to maintain insurance created a risk of pecuniary loss to him for his failure to do so. Although Nautilus contends that neither Ms. Manent nor Ms. Baldwin told him that they were going to hold him personally responsible if he failed to get proper insurance, it is sufficient that the event insured against " 'might' " subject Mr. Perrett to loss " 'and that pecuniary injury would be the natural consequence.' " *G.M. Battery,* 747 S.W.2d at 626 (citation omitted). Thus, Mr. Perrett's obligation to procure property insurance on the apartment building for its replacement value was sufficient to create an insurable interest in the apartment building for that amount. Nautilus' first point is denied.

### Mr. Perrett's Financial Interest Equal to Insurable Interest

In its second point, Nautilus argues that the trial court erred in denying its motions for a directed verdict and for a judgment notwithstanding the verdict because the insurance policy limits Mr. Perrett's recovery to his "financial interest" in the apartment building. Nautilus contends that the term "financial interest," as used in the policy, is not synonymous with "insurable interest" and is, in fact, "substantially more restrictive." Nautilus argues that Mr. Perrett had no financial interest in the apartment building and, therefore, was not entitled to any insurance proceeds.

Before addressing Nautilus' specific claim, it should be noted that, generally, once it is determined that the insured has an insurable interest in the covered property, section 379.140, RSMo 2000,[3] prohibits the insurance company from contesting the value of that interest. Section 379.140, referred to as a valued policy statute, provides:

> In all suits brought upon policies of insurance against loss or damage by fire hereafter issued or renewed, the defendant shall not be permitted to deny that the property insured thereby was worth at the time of the issuing of the policy the full amount insured therein on said property; and in case of total loss of the property insured, the measure of damage shall be the amount for which the same was insured, less whatever depreciation in value, below the amount for which the property is insured, the property may have sustained between the time of issuing the policy and the time of the loss, and the burden of proving such depreciation shall be upon the defendant; and in case of partial loss, the measure of damage shall be that portion of the value of the whole property insured, ascertained in the manner prescribed in this chapter, which the part injured or destroyed bears to the whole property insured.

The Supreme Court has interpreted this statute to prohibit insurance companies from asserting that the value of the insured's interest is less than the full face amount of the policy. *See G.M. Battery,* 747 S.W.2d at 627–28; *DeWitt,* 667 S.W.2d at 706–08. For example, in *G.M. Battery,*

**3.** All statutory references are to the Revised Statutes of Missouri 2000.

the Supreme Court found that a lessee who held an option to purchase the property had an insurable interest in the property. 747 S.W.2d at 627. Because of this insurable interest, the Court held that the lessee was "entitled to recover the full face amount of the policy for the total loss." *Id.* The Court stated that section 379.140 "mandated" such a result, as the statute placed "the risk of overinsurance on the insurer rather than on the insured." *Id.* at 627–28. The Court then discussed how section 379.140 affects the insurer's rights and responsibilities in issuing and paying under policies:

> The insurer may protect itself by strictly defining the interest covered by its policy, or by obtaining representations or warranties about the state of the title, if it deems this information important. What it cannot do is to issue a policy, collect the premiums, and then argue that the value of the insured's insurable interest in the property is less than the coverage it underwrites.

*Id.* at 628.

One of the cases the Court cited for this principle was *DeWitt.* In *DeWitt,* after the Court found that an insured with a limited ownership interest had an insurable interest in the property, the Court stated that it was "unnecessary to determine the extent of her interest in the property" because she was entitled to recover the policy limits under the valued policy statute. 667 S.W.2d at 706–07. In so holding, the Court rejected the insurance company's argument that section 379.140 does not apply when the insured has only a limited or non-ownership interest in the property. *Id.* at 707. The Court reasoned that the purpose of section 379.140 "is to place upon the *insurers* the burden and responsibility for an evaluation of the insured's interest and of the property insured at the date of the insurance

contract." *Id.* at 707–08. Because the insured had not committed fraud or concealment in obtaining the policy, had not misrepresented her interest at any time before the loss, and had not materially changed her interest during the policy term, the Court found that the purpose of the valued policy statute was served by awarding the insured the whole policy limits. *Id.*

The Supreme Court's rulings in *G.M. Battery* and *DeWitt* seem to prohibit the utilization of a "financial interest" provision to limit coverage to less than the face value of the policy, on the basis that it is contrary to section 379.140, the valued policy statute. This court has implied otherwise, however, in *Gorman,* 977 S.W.2d at 524. In *Gorman,* this court stated that "the valued policy statute is not an impediment to an insurer's expressly and strictly defining in the contract of insurance an insured's insurable interest under the policy so as to limit his or her coverage." In reaching this conclusion, this court cited the principle from *G.M. Battery* that:

> The insurer may protect itself by strictly defining the interest covered by its policy, or by obtaining representations or warranties about the state of the title, if it deems this information important. What it cannot do is to issue a policy, collect the premiums, and then argue that the value of the insured's insurable interest in the property is less than the coverage it underwrites.

*Gorman,* 977 S.W.2d at 524 (quoting *G.M. Battery,* 747 S.W.2d at 628).

*Gorman* interprets the Court's statement that "[t]he insurer may protect itself by strictly defining the interest covered by its policy" as permitting the insurance company to pay less than the face value of the policy, which is the amount upon which the insured's premiums were based, so long as the policy expressly and strictly

defines the "insured's insurable interest under the policy so as to limit his or her coverage." *Id.* This interpretation seems to be contrary to the Court's next statement in *G.M. Battery* that "[w]hat [an insurer] cannot do is to issue a policy, collect the premiums, and then argue that the value of the insured's insurable interest in the property is less than the coverage it underwrites." *G.M. Battery*, 747 S.W.2d at 628. Thus, while *Gorman* implies that the insurer can use a restrictive definition of the insured's interest to limit coverage after a policy is issued, *G.M. Battery* appears to hold that the insurer should use a restrictive definition of the insured's interest to underwrite coverage but, once the policy is issued, the insurer cannot dispute the value of the insured's insurable interest. This court, therefore, questions whether *Gorman's* statement on this issue is consistent with *G.M. Battery*.

This court need not resolve its concerns, however, because this case does not involve a total loss.[4] Thus, section 379.140, the valued policy statute, does not govern. *See Wells v. Mo. Prop. Ins. Placement Facility*, 653 S.W.2d 207, 210 (Mo. banc 1983).[5] Moreover, even if the restrictive provision in this case limiting Mr. Perrett's recovery to his "financial interest" was valid, this court finds that Mr. Perrett's "financial interest" is equal to his insurable interest. The term "financial interest" is found in a subsection entitled, "LOSS CONDITIONS," under the heading, "Loss Payment." In this subsection, the policy states that in the event of loss or damage to the covered property, i.e., the apartment building, Nautilus "will not pay you more than your financial interest in the Covered Property."

When interpreting an insurance policy, this court is to give the policy a reasonable construction and interpret the policy "so as to afford rather than defeat coverage." *Farm Bureau Town & Country Ins. of Mo. v. Hilderbrand*, 926 S.W.2d 944, 947 (Mo.App.1996). As in any other contract, the primary rule of interpretation of an insurance policy "is to ascertain the intent of the parties and give effect to that intent." *Id.* If the contract is not ambiguous, this court determines the parties' intent solely from the language of the contract. *Id.* "An ambiguity arises where there is duplicity, indistinctness or uncertainty in the meaning of the words used in the contract." *Id.*

Even though this provision is in the subsection entitled, "Conditions," it is meant to limit Nautilus' liability under the policy and, therefore, is actually an exclusion. *See S. Gen. Ins. Co. v. WEB Assocs./Elecs., Inc.*, 879 S.W.2d 780, 782 (Mo.App.1994) (holding that policy provisions that limit the insurer's obligation instead of endow coverage are considered exclusions). In drafting insurance policies, the insurer "has the opportunity to clearly word exclusions and limits of liability." *Id.* Thus, "[p]olicy provisions designed to restrict, limit or impose exceptions or exemptions on insurance coverage will be strictly construed against the insurer."

---

4. Mr. Perrett initially claimed that he suffered a total loss to the apartment building, and the facts would support a finding of total loss. During the jury instruction conference, however, Mr. Perrett did not object when Nautilus offered, and the court accepted, a damage instruction for partial loss. Also, Mr. Perrett states in his brief on appeal that the measure of damages for his loss was the standard for partial loss stated in Nautilus' damage instruction.

5. There is also a question as to whether Mr. Perrett's inaccurate information as to ownership of the apartment building, found by the jury not to be a material misrepresentation, would preclude application of the valued policy statute. *See DeWitt*, 667 S.W.2d at 707–08.

*Hilderbrand,* 926 S.W.2d at 947. In doing so, however, "[c]ourts are not authorized, under the guise of interpretation or construction, to alter or rewrite a policy, and they may not create an ambiguity where none exists." *S. Gen. Ins.,* 879 S.W.2d at 782.

The term "financial interest" is not defined in the policy. Where a term is not defined in an insurance policy, this court must give the term "its ordinary meaning unless it plainly appears that a technical meaning was intended." *Mansion Hills Condo. Ass'n v. Am. Family Mut. Ins. Co.,* 62 S.W.3d 633, 638 (Mo.App. 2001). "To determine the ordinary meaning of a term, courts will consult standard English language dictionaries." *Id.*

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (1993) does not contain a definition of the term "financial interest." "When a term consists of more than one word ... and an applicable definition for the term itself cannot be found in the dictionary, it still can be somewhat helpful to look to the dictionary's definitions of the term's *constituent parts* as an aid to understanding." *Mansion Hills Condo. Ass'n,* 62 S.W.3d at 639. The dictionary defines "financial" as "relating to finance or financiers." WEBSTER'S at 851. The definition of "finance" reads "1 finances *pl* : the pecuniary affairs or resources of a state, company, or individual[.]" *Id.* "Pecuniary" is defined as "1: taking the form of or consisting of money ... 2: of or relating to money: monetary." *Id.* at 1663. The term "interest" is defined as "1 a: right, title, or legal share in something ...: participation in advantage, profit, and responsibility ... STAKE, CLAIM b: something in which one has a share of ownership or control: BUSINESS[.]" *Id.* at 1178. Applying these dictionary definitions, a financial interest in the covered property can be defined as either (1) a

monetary right, title, or legal share in the property; (2) a monetary advantage, profit, and responsibility, i.e., a monetary stake or claim in the property; or (3) a monetary share of ownership or control in the property.

Nautilus bases its argument that Mr. Perrett had no financial interest in the property on the fact that he was merely a shareholder in the corporation that owned the apartment building. Relying on the definition of "financial interest" found in BLACK'S LAW DICTIONARY 631 (6th ed.1990), which was the definition given to the jury, Nautilus contends that Mr. Perrett had no financial interest because he had no "interest equated with money or its equivalent." Nautilus notes that it was not Mr. Perrett but JAM, Inc., who owned the building; Ms. Manent, who was obligated under the promissory note to pay the mortgage; and Mr. Brock, who was entitled to the mortgage proceeds. Thus, Nautilus argues that while JAM, Inc., Ms. Manent, and Mr. Brock had financial interests in the property because they all possessed "an interest equated with money or its equivalent," Mr. Perrett did not.

In making this argument, Nautilus interprets this definition, which is essentially the same definition of "financial interest" derived from WEBSTER'S DICTIONARY, too narrowly. It is true that JAM, Inc. had a financial interest in the apartment building because it was the title owner of the building. Ms. Manent had a financial interest in the apartment building because she was legally responsible under the promissory note for paying the mortgage on the building. Likewise, Mr. Brock had a financial interest in the apartment building because he held the deed of trust securing the mortgage on the property.

The dictionary definitions indicate, however, that the term "financial interest" encompasses more than just ownership, a

monetary responsibility under a promissory note, or a legal monetary right under a deed of trust. A financial interest in property also includes a monetary stake or claim in the property or a monetary responsibility for the property. Mr. Perrett had a monetary stake or claim in the property and a monetary responsibility for the property as a shareholder in the corporation that owned the property and by virtue of his agreement with Ms. Manent and Ms. Baldwin to obtain and maintain insurance on the property, which rendered him potentially liable for the full amount of the insurance proceeds in the event of a loss. Mr. Perrett had a monetary responsibility for the property and a monetary stake in the property equal to the full amount of insurance proceeds.

In this case, Mr. Perrett's financial interest in the apartment building happens to be equal to his insurable interest in the apartment building. While Nautilus argues that the terms "insurable interest" and "financial interest" must always refer to different interests, their definitions contain similar elements. An "insurable interest" is a relation or concern in property such that one will " 'derive pecuniary benefit or advantage from its preservation, or will suffer pecuniary loss or damage from its destruction.' " *G.M. Battery,* 747 S.W.2d at 626 (citation omitted). Likewise, a "financial interest" can be, among other things, a pecuniary advantage, profit, or responsibility, or a pecuniary stake or claim in property.

Although ownership in the covered property would create both an insurable and a financial interest, neither type of interest requires ownership. To read such a requirement into the term "financial interest," as it is used in the loss liability limit provision, would be contrary to the rule that such provisions are to be strictly construed against the drafter. *See S. Gen.*

*Ins. Co.,* 879 S.W.2d at 782. All that is required is that the insured have a relationship to the property that has a monetary impact on the insured. In this case, Mr. Perrett's agreement to obtain and maintain insurance on the property for the benefit of JAM, Inc. created a relationship to the property such that his failure to obtain proper insurance rendered him potentially liable for the full amount of the insurance proceeds to which the corporation would be entitled in the event of a loss. Therefore, Mr. Perrett had a financial interest in the covered property equal to his insurable interest, which was the full amount of the insurance proceeds payable under the policy. Nautilus' second point is denied.

### Damages Limited to Difference in Fair Market Value Before and After Loss

The decision that Mr. Perrett had coverage for his insurable interest in the apartment building leads to Nautilus' fourth point, which concerns the amount of damages Mr. Perrett can recover. The jury awarded Mr. Perrett $105,000 in damages, which represents the combined policy limits for loss to the building, $100,000, and debris removal, $5,000. In this point, Nautilus asserts that the trial court erred in denying its motion for new trial because the damages awarded on the policy were excessive and were not supported by the evidence. First, Nautilus argues that even if this court finds that Mr. Perrett did have a financial interest in the apartment building, his financial interest was only $1,000, and that was all he was entitled to recover. As this court has already discussed, however, Mr. Perrett's financial interest in the apartment building was equal to his insurable interest in the property, which was for the full amount of the insurance proceeds payable under the poli-

cy. Second, Nautilus argues that regardless of Mr. Perrett's financial interest in the property, the amount of damages Mr. Perrett can recover were limited by statute to only $86,000, which is the difference between the fair market value of the apartment building before and after the loss.

 The statute to which Nautilus refers is section 379.150. This statute sets out the measure of damages in the case of a partial loss to property. *Wells*, 653 S.W.2d at 210. Section 379.150 provides, in pertinent part, that where there is a partial loss to covered property, the insured may receive "a sum of money equal to the damage done to the property" not exceeding the policy limit. This sum is calculated by taking the "difference between the reasonable values of the property immediately before and immediately after the casualty." *Wells*, 653 S.W.2d at 210. The insured has the burden of proving the fair market value of the property both before and after the loss. *Id.* at 211.

In this case, Mr. Perrett testified that the fair market value of the apartment building before the fire was $86,000, which was the amount for which he contracted to sell when he signed a real estate sale contract on the property in February 1999.[6] When asked what the fair market value of the apartment building was after the fire, Mr. Perrett testified that, in light of the fact that the cost of repairing the property was over $115,000, the property had a "negative" or "less than zero" value after the fire.

 Mr. Perrett argues that, relying on his testimony, the jury could have subtracted the $115,000 cost of repair from the $86,000 fair market value before the fire to determine that the property had a negative value of $29,000.[7] Since the jury was limited to awarding only $100,000 for loss to the building, Mr. Perrett surmises that the jury then reduced the damages to that amount. The Supreme Court stated in *Wells*, however, that while the "[c]ost of repair is admissible as evidence of damage," it, standing alone, "is insufficient to establish the amount of damage." *Id.* at 214. Mr. Perrett's testimony that his property had a "negative value" was based solely on the cost of repair and, therefore, was insufficient to establish his damages. The remaining evidence, in the light most favorable to the jury's verdict, establishes that the value of the apartment building after the fire was $0. Thus, Mr. Perrett was entitled to damages for loss to the apartment building in the amount of $86,000, which represents the difference between the fair market value of the property before and after the fire. The actual damages award is, therefore, reversed, and remanded to the trial court with instructions to award Mr. Perrett $86,000 in damages on the insurance policy for loss to the apartment building. This award does not affect the $5,000 awarded to Mr. Perrett under the policy for debris removal, so the actual damages under the policy to which Mr. Perrett was entitled were $91,000. The prejudgment interest award should be recalculated accordingly. Nautilus' fourth point is granted, in part, and denied, in part.

6. The $86,000 sales price presumably includes the price of the lot. There was no evidence, however, as to the value of the lot and, in fact, Nautilus repeatedly refers to the $86,000 amount as being the fair market value of the apartment building.

7. In his brief, Mr. Perrett argues that the jury could have arrived at a negative value of $19,000 after subtracting $115,000 from $86,000. The $19,000 figure is a mathematical error, as $86,000 minus $115,000 is negative $29,000.

### Sufficient Evidence to Submit Vexatious Refusal to Pay Claim

In its third point, Nautilus argues that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict on the issue of its liability for vexatious refusal to pay. Mr. Perrett sought damages for vexatious refusal to pay under section 375.296.[8] Section 375.296 provides for the insurer to pay additional damages for vexatious refusal to pay under the policy:

> [I]f the insurer has failed or refused for a period of thirty days after due demand therefor prior to the institution of the action, suit or proceeding, to make payment under and in accordance with the terms and provisions of the contract of insurance, and it shall appear from the evidence that the refusal was vexatious and without reasonable cause, the court or jury may, in addition to the amount due under the provisions of the contract of insurance and interest thereon, allow

the plaintiff damages for vexatious refusal to pay and attorney's fees as provided in section 375.420.[9]

For Nautilus' vexatious refusal to pay, the jury awarded Mr. Perrett $5,000 as a penalty and $25,000 in attorney's fees. Nautilus argues that Mr. Perrett failed to make a submissible case for vexatious refusal to pay because the evidence does not show that Nautilus' refusal to pay was willful and without reasonable cause.

 "To support the imposition of the penalty under the statute, plaintiff must show that the insurer's refusal to pay the loss was willful and without reasonable cause, as the facts would appear to a reasonable and prudent person." *DeWitt*, 667 S.W.2d at 710. That the insurer ultimately is found to be liable under the insurance policy is not determinative of whether its initial refusal to pay was vexatious. *Morris v. J.C. Penney Life Ins. Co.*, 895 S.W.2d 73, 76 (Mo.App.1995). Rather, whether the insurer's failure to pay was

---

8. Although Nautilus states in its brief that Mr. Perrett was seeking damages under section 375.420, which provides for damages for vexatious refusal to pay where the insurer has "refused to pay such loss without reasonable cause or excuse," the jury instruction clearly indicates that he was seeking damages for vexatious refusal to pay under section 375.296. Nautilus submitted the jury instruction, which was MAI 10.08. This pattern instruction provides that the jury may award additional damages "[i]If you find in favor of plaintiff on the claim on the insurance policy, and if you believe that defendant insurance company [refused to pay] [failed or refused to pay for a period of thirty days after demand] without reasonable cause or excuse[.]" MAI 10.08 [1992 New] (Footnotes omitted.) The Notes on Use state that the first bracketed phrase applies to actions under section 375.420, while the second bracketed phrase applies to actions under section 375.296. The instruction Nautilus submitted used the second bracketed phrase. The parties do not contend that the jury instruction was erroneous. Therefore, this court will not address

the propriety of submitting the case under section 375.296 but will instead focus on whether the evidence was sufficient to support such submission.

9. Section 375.420 provides:

> In any action against any insurance company to recover the amount of any loss under a policy of automobile, fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance except automobile liability insurance, if it appears from the evidence that such company has refused to pay such loss without reasonable cause or excuse, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed twenty percent of the first fifteen hundred dollars of the loss, and ten percent of the amount of the loss in excess of fifteen hundred dollars and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict.

vexatious must be based on the facts as presented at the time the insurer was asked to pay under the insurance policy. *Hopkins v. Am. Econ. Ins. Co.*, 896 S.W.2d 933, 939 (Mo.App.1995).

"An insurer is permitted to question or contest its liability if it has reasonable cause to believe, and does believe, that it has no liability under the policy and that it has a meritorious defense." *State ex rel. Webb v. Hartford Cas. Ins. Co.*, 956 S.W.2d 272, 276 (Mo. App.1997). The existence of a litigable factual or legal issue, however, "does not preclude a vexatious penalty where there is evidence the insurer's attitude was vexatious and recalcitrant." *DeWitt*, 667 S.W.2d at 710. To prove vexatious refusal to pay, the insured is not required to present direct and specific evidence. *Id.* Instead, the jury may find that the refusal to pay was vexatious based "upon a general survey and a consideration of the whole testimony and all the facts and circumstances in connection with the case." *Id.* Circumstances the jury may properly consider in making this determination include, but are not limited to, "the insurer's failure to return the premiums paid, the adequacy of their investigation of the claim, and ... the explanation given by the insurer for denying the claim." *Id.*

In this case, Nautilus sent its letter denying Mr. Perrett's claim under the policy over four months after Mr. Perrett demanded payment from Nautilus by submitting his sworn proof of loss statement. As Nautilus refused to pay within thirty days after Mr. Perrett due demand was made, Mr. Perrett was entitled to recover under section 375.296 if Nautilus' refusal to pay was willful and without reasonable cause.

On this issue, Nautilus argues that its denial was reasonable because Mr. Perrett, as only a shareholder in JAM, Inc.,

did not have an insurable interest in the apartment building. In its denial letter, Nautilus stated that it had reviewed Mr. Perrett's proof of loss statement, his statement under oath, and Missouri law, and that it had "secured the input" of its underwriting department concerning what the department "would have done if the representations given to them about ownership and financing of the property had been truthful." Nautilus then stated that it was denying the claim because, after "careful review," it was Nautilus' belief that Mr. Perrett did not have an insurable interest in the apartment building.

As this court has discussed, however, a 1981 Missouri case, *Berry*, 621 S.W.2d at 951, held that a shareholder has an insurable interest in corporate property. Furthermore, in addressing the evidence supporting the insured's vexatious refusal to pay claim, the court in *Berry* stated that "[t]he defense of lack of an insurable interest was tenuous at best." *Id.* at 954. Thus, even in *Berry*, which appeared to be the first Missouri case addressing the issue of a shareholder's insurable interest in corporate property, the court rejected the lack of an insurable interest as a reasonable basis for not paying and found that the insurer was properly held liable for vexatious refusal to pay. *Id.*

The evidence indicates that Nautilus was made aware of Mr. Perrett's status as one of three shareholders of the corporation that owned the apartment building the day after the fire, when one of its agents, Ms. Dowell, was told that there were "multiple owners" and that "John Perrett bought out partners." This information, and a review of the *Berry* case, should have put Nautilus on notice that, at the very least, Mr. Perrett had an insurable interest in the apartment building as a shareholder of the corporation that owned the building. Yet, Nautilus did not make its offer to pay even

an amount equal to Mr. Perrett's one-third interest in JAM, Inc., until four months after Mr. Perrett filed his sworn proof of loss statement, which was eleven months after the fire.

■ Moreover, Missouri Supreme Court and appellate court cases have repeatedly stated that an insurable interest is not dependent upon title, lien, or possession of the property. *DeWitt,* 667 S.W.2d at 705. Rather, the insured has an insurable interest in the property " 'where he has such a relation or concern in such subject matter that he will derive pecuniary benefit or advantage from its preservation, or will suffer pecuniary loss or damage from its destruction, termination, or injury by happening of the event insured against.' " *G.M. Battery,* 747 S.W.2d at 626 (citation omitted). Indeed, it is the policy of Missouri courts to "make every effort to find insurable interest, and to sustain coverage, when there is any substantial possibility that the insured will suffer loss from the destruction of the property." *Id.* at 627. This court applied these principles in *Gorman,* 977 S.W.2d at 526, stating that where the non-owner insureds had a contractual obligation to the property's owner to maintain insurance on property, the insureds' "subsequent risk of loss for any failure to maintain the insurance may well have created an insurable interest in the [insureds] for the policy limits." In light of Missouri case law on insurable interests, Nautilus' denial of coverage, without investigation and based upon the erroneous conclusion that Mr. Perrett had no insurable interest because he was not the owner of the property, supports the jury's finding that Nautilus' refusal to pay within thirty days after demand was made was vexatious.

■ Nautilus further argues that its refusal to pay was reasonable because it had cause to believe that Mr. Perrett had misrepresented a material fact when he listed himself, and not JAM, Inc., as the owner of the property on the insurance application. Under the policy, a misrepresentation of a material fact concerning the insured's interest in the covered property voids coverage.

Nautilus' own underwriter, however, testified that had she known that JAM, Inc., and not Mr. Perrett, was the title owner of the apartment building, she would have agreed to underwrite the policy. The policy simply would have listed JAM, Inc., instead of Mr. Perrett, as the named insured. Otherwise, the policy would have been the same, with the same amount of coverage and the same premium. Because Nautilus would have accepted the risk on the same terms if it had known that JAM, Inc., was the title owner and not Mr. Perrett, the jury could properly find that Nautilus' denial of coverage on the basis of Mr. Perrett's misrepresentation was unreasonable and, therefore, supported his claim for vexatious refusal to pay.

The evidence was sufficient to support submission of Mr. Perrett's claim for damages for vexatious refusal to pay. Nautilus' third point is denied.

### Conclusion

This court finds that Mr. Perrett had an insurable and financial interest in the apartment building for the full amount of coverage payable under the policy. Because he suffered a partial loss, his damages for loss to the apartment building were limited to the difference between the fair market value of the property before and after the loss, which the evidence shows was $86,000. Mr. Perrett's total actual damages, including damages for debris removal, were $91,000. Therefore, the actual damages award is reversed, and the cause is remanded to enter an award of actual damages in the amount of

$91,000, plus prejudgment interest that has been recalculated accordingly. This court further finds that Mr. Perrett made a submissible claim for damages for vexatious refusal to pay, so that award is affirmed.

All concur.